United States Court of Appeals,

Eleventh Circuit.

No. 96-8718.

UNITED STATES of America, Plaintiff-Appellee,

v.

Willie D. JACKSON, Defendant-Appellant.

July 21, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CR-414-WCO), William C. O'Kelley, Judge.

Before HATCHETT, Chief Judge, BARKETT, Circuit Judge, and PROPST[*], Senior District Judge.

PER CURIAM:

Defendant raises four basic issues. These relate to (1) the giving of an "aiding and abetting" charge; (2) the sufficiency of the evidence; (3) a "conversion" jury instruction; and (4) the sentencing of the defendant based on civil rights violation(s). We find no error, certainly no harmful error, with regard to the first three issues. We remand for resentencing.

BACKGROUND

On July 22, 1995, a Field Investigation Team ("FIT") of the Atlanta (Georgia) Police Department was provided a copy of the Florida arrest warrant for Al Jenkins, an individual wanted for an in-home invasion robbery in South Florida. The FIT was also informed that Al Jenkins was registered at the Edgemont Motor Inn, a hotel just outside of Atlanta in the City of Conley.

Three members of the FIT, Officers Willie Jackson (the defendant), Wadley and Entriken, went to the hotel looking for Jenkins. They found the room of Jenkins, the door of which had been left ajar, and entered without knocking and with weapons drawn. Jenkins was absent, but present was Kathy Renfro, a woman previously reported to be in Jenkins's company. The officers detained Renfro and began interrogating her, without reading her *Miranda* warnings. Without her consent, they also began to search the motel room.

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

The search was extensive. After it became clear that neither a weapon nor the fugitive was present, the officers continued looking. Officer Jackson discovered under the mattress in the room a wad of bills totaling $1545.00. Without counting the money out loud, Officer Jackson placed the money in his pocket.[1] Near the conclusion of the search, the officers handcuffed Renfro, telling her that if she did not reveal the location of Jenkins she would be transported to the penitentiary. Later, before she was transported to the precinct office, the handcuffs were removed.

At the precinct office, Renfro was seated in a chair five feet from Officer Jackson's desk. Although her sight was blocked most of the time, at one point she was able to discern a pile of money on the desk. Later, she was told to leave the room and get a drink of water. She was gone for approximately two minutes. When she returned, Officer Jackson told Officer Wadley to take the pile of money sitting on the desk and count it. It was then placed in an Atlanta Police Department ("APD") property envelope. Wadley took the envelope to the APD Property Unit. Renfro was provided with an inventory receipt form which stated the amount seized as $1045.00. Renfro signed the form and noted that the money was not hers. The officers then called a cab for Renfro and instructed her to go directly to the airport and to fly to her home in Houston, Texas.

Kathy Renfro was, in fact, Federal Bureau of Investigation Special Agent Kathy Jenkins, and the defendant had walked into a sting operation. With the help of the APD, the FBI had fabricated the identities of Al Jenkins and Kathy Renfro in an effort to uncover alleged corruption in the FIT. A camera had been placed in the hotel room to record all activities that took place and definite amounts of money belonging to the FBI had been planted about the room for discovery by the officers.

The defendant was found guilty, at trial, on a one-count indictment, which charged, pursuant to 18 U.S.C. § 641, that he had stolen and converted to his own use and the use of others $500 of funds belonging to the FBI.

THE SENTENCING HEARING

---

[1]When the FBI later examined the hotel room, another $985.00 that had been placed behind a vent in the bathroom was missing.

On May 31, 1996 (Friday), approximately three days before the sentencing hearing on June 3, 1996 (Monday), the Government filed a motion for upward departure. The motion was "faxed" to defendant's counsel and received by him on May 31, 1996. The motion states, *inter alia:*

> The Government moves for an upward departure on the basis that defendant committed violations of the constitutional rights of the undercover agent during the commission of the theft offense for which defendant was convicted.

> .   .   .   .   .

> Once the court determines that the departure is authorized, then the court *must find a way to guide the extent of the departure,* so that it is deemed to be reasonable. Here that step is easily taken because the violation of constitutional rights by state actors is specifically governed by USSG § 2H1.1. Under that guideline section, defendant's offense level would be calculated as a level 18 with a custody guideline range of 27-33 months.

> WHEREFORE, the Government respectfully moves for an upward departure on the basis that constitutional rights violations were committed by defendant and Officers Wadley and Entriken at the time that defendant committed the theft offense for which he was convicted. (Emphasis added).

At the sentencing hearing, the trial judge determined that the theft offense charged in the indictment pursuant to Title 18 U.S.C. § 641, of which the defendant was convicted, was accompanied by civil rights violation(s). He found that there was not a search warrant; that the defendant was outside his jurisdiction as a police officer; and, that the defendant's search went beyond any arguably reasonable basis for searching for a fugitive. The trial judge also noted the abusive nature of the search itself and suggested that the arrest of the undercover agent was unlawful.

With regard to how the defendant's guideline range would be calculated, the trial judge stated, *inter alia,*

> I view that the theft or the larceny calculations [§ 2B1.1] are really not the correct approach, that the more appropriate approach is the civil rights violation [§ 2H1.1(a)(2) ].

> .   .   .   .   .

> This is taking the civil rights violation and saying that it is the most appropriate area under which to calculate it. *It doesn't add to the theft ones. The theft ones are set aside,* and you calculate the civil rights calculations totally independent from zero. They're not added on top of the 12 or the 15 [pursuant to § 2B1.1].[2] (Emphasis added)

---

[2] The probation office, in the presentence report, had apparently premised its calculations on § 2B1.1 and had used the theft guideline as a starting point.

. . . . .

> [B]ut I do intend to and will depart upward [from § 2H1.1(a)(2) as enhanced by § 2H1.1(b)(1)(a) ] based upon that impact [on society and the court system and the judicial processes].

The defendant's attorney asked, "So in your findings, you're going to establish how we made the jump from theft to civil rights?"  The trial judge responded,

> That's right.  I said that I think that's the more appropriate definition of what the offense is in the way of calculating it, and it doesn't add to it.[3]  The calculation there gives you the basic of 12 points [base offense level] under the code section.  Guideline section of 2H1.1(a)(2) gives the base offense level of 12, and it gives an addition of ... under that same code section but subsection (b)(1)(A)1, six level enhancement if the defendant was a public official, such as a police officer.

The trial court determined the adjusted offense level by adding a base offense level 12 (§ 2H1.1(a)(2)) to 6 for a specific offense characteristic (§ 2H1.1(b)(1)(A)) and then departing upward by an additional 6 levels based upon the impact on society, the courts, the judicial processes, etc., for a total of 24.[4]  This created, with a Criminal History Category of I, a sentencing range of 51-63 months.  The trial court then sentenced the defendant to 60 months imprisonment.  The defendant objected to the trial court's using § 2H1.1 rather than § 2B1.1 to determine the base offense level and to its using the specific offense characteristic provision of § 2H1.1.  Although the trial judge made it plain that he felt that proceeding as if the defendant had committed a civil rights violation was the appropriate basis for sentencing, he did not cite any authority from the Sentencing Commission Guidelines Manual or from cases to support his action.[5]

ANALYSIS

Appendix A—Statutory Index to the Guidelines Manual specifically provides that the guideline section "ordinarily applicable to the statute of conviction" (here Title 18 U.S.C. § 641) is

---

[3]The trial judge was making it plain that he was not departing upward from or enhancing a § 2B1.1 sentencing range.

[4]The trial judge also found that a number of cases which had been investigated by the defendant had been dismissed by the prosecutor because of the defendant's proven corruption.

[5]Since we are remanding for resentencing, we do not decide whether the defendant was properly notified of the intended basis for sentencing so that he had a reasonable opportunity to respond.

§ 2B1.1.  Appendix A also provides, "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to *the nature of the offense conduct charged in the count* of which the defendant was convicted.  (See § 1B1.2)."  (Emphasis added).

Section 1B1.2(a) of the Sentencing Commission Guidelines Manual provides as follows:

> Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment or information of which the defendant was convicted).  *Provided,* however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two most applicable to the stipulated offense.

It is clear in this case that there was no plea agreement and no "stipulation that specifically establishe[d] a more serious offense than the offense of conviction."  Thus, § 1B1.2(a) cannot be used as a basis for applying § 2H1.1 in determining the base offense level in this case.  The only arguable Guidelines Manual authority for the action of the trial court is the above quoted language from the introduction to Appendix A—Statutory Index.  The trial court made no express finding that this was an "atypical case" although, in fairness, it is implicit in his findings.  Further, this exception refers to "the nature of the offense charged in the count of which the defendant was convicted."[6]  The indictment in this case did not *charge* a civil rights violation or give any indication that a civil rights violation was implicated.[7]

The Government has cited four cases in support of its argument that the trial court began

---

[6]Note that similar language is used in § 1B1.2(a).

[7]The indictment charges:

*Count One*

> On or about July 22, 1995, in the Northern District of Georgia, the defendant, Willie D. Jackson, did willfully and knowingly steal, purloin and convert to his own use and the use of others $500.00 in United States Currency belonging to the Federal Bureau of Investigation, an agency of the United States Government, in violation of Title 18 United States Code § 641.

with the appropriate guideline.[8]  These cases are *U.S. v. Ledesma,* 979 F.2d 816 (11th Cir.1992);

*U.S. v. Kim,* 896 F.2d 678 (2d Cir.1990);  *U.S. v. Hernandez,* 941 F.2d 133 (2d Cir.1991);  and *U.S.*

*v. Sanders,* 982 F.2d 4 (1st Cir.1992).[9]

We note that *Ledesma* involved a sentencing after a guilty plea pursuant to a plea agreement.

Further, the sentence was pursuant to § 2D1.1, the appropriate guideline for convictions under Title

21 §§ 841 and 846, of which the defendant was convicted.  *Kim* also involved a plea of guilty and

plea agreement.  Further, the upward departure was generally based upon § 5K2.0.  The sentence

did not proceed from a guideline not designated in Appendix A for the statutory offense of

conviction.  *Hernandez* involved a plea of guilty.  Further, there was a departure upward from the

ordinary guideline, *measured* by the consideration of another statute as "an aid."  *Sanders* also

involved a plea of guilty.  Further, it is likewise inapposite because it does not discuss either § 1B1.2

or the introductory language to Appendix A.  For a more closely related case, see *U.S. v. Day,* 943

F.2d 1306 (11th Cir.1991).  In *Day,* however, there was a plea agreement with a "stipulation."[10]

In *Braxton,* the Supreme Court stated (considering the pre-1992 version of § 1B1.2(a)):

> Ordinarily, a court pronouncing sentence under the Guidelines applies the "offense guideline section ... most applicable to the offense of conviction." § 1B1.2(a).  There is, however, one "limited" exception to this general rule, § 1B1.2, comment 1, n. 1, consisting of the following proviso to § 1B1.2(a):
>
> > Provided, however, in the case of conviction by a plea of guilty or nolo contendere containing a stipulation that specifically establishes a more serious offense than the offense of a conviction, [the court shall apply the guideline in such chapter] most applicable to the stipulated offense.

Braxton's conviction was no doubt by a "plea of guilty."  This case presents the questions

---

[8]In its brief the Government states, "It is somewhat unclear whether the district court simply granted the government's motion for upward departure and employed the civil rights guidelines to guide his departure or whether the court sentenced the defendant under the civil rights guideline...."

We conclude that it is amply clear that the trial court did the latter.

[9]The Government apparently also relies upon the introductory language in Appendix A to support its argument.

[10]We note that the language of § 1B1.2 was changed on November 1, 1992 to refer to a plea agreement rather than a plea of guilty or nolo contendere.  Compare the discussion in *Day* and in *Braxton v. U.S.,* 500 U.S. 344, 111 S.Ct. 1854, 114 L.Ed.2d 385 (1991) in this regard.

whether it was also a conviction by a plea (1) "containing a stipulation" that (2) "specifically establishes" that Braxton attempted to kill the marshals who had been sent to arrest him.

Applying the "limited" exception, the Court concluded that the stipulation did not establish a more serious offense and that the trial court misapplied § 1B.2(a).

In *U.S. v. Elefant,* 999 F.2d 674 (2d Cir.1993) there was a plea of guilty and a plea agreement, but the court also suggested that the introductory language in Appendix A may have application independent of § 1.B1.2(a). ("[W]e understand the exception described in Appendix A to cover those cases, probably few in number, where the conduct constituting the offense of conviction also constitutes another, more serious offense, thereby rendering the offense conduct not typical of the usual means of committing the offense of conviction.") The court concluded that the defendant, who was convicted under Title 18 U.S.C. § 641, should be sentenced under an obstruction of justice guideline (§ 2J1.2) rather than the theft guideline (§ 2B1.1).[11]

*Elefant's* holding, to the extent that it relied upon the introductory language in Appendix A, appears to run counter to the holding in *U.S. v. McCall,* 915 F.2d 811 (2d Cir.1990), where the court stated:

> The government also mistakenly relies on the introductory comments to the Statutory Index which provide that "[i]f, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. App. A at A.1. The district court did not find that this was an "atypical case." Even if it had, it would still have been limited by the "nature of the offense conduct charged in the count of which [McCall] was convicted." A plausible reading of this clause would permit a court to consider the implications *of facts recited in the information* but additional to the specific crime charged. However, *the facts alleged in the information* charging McCall establish neither "atypical" circumstances nor a sufficiently severe "nature of offense conduct" to justify selecting Section 2A2.1. (Emphasis added).

In *United States v. Brunson,* 882 F.2d 151 (5th Cir.1989), the court rejected the government's argument that the above quoted introduction to Appendix A of the guidelines authorized the district

---

[11]*See also U.S. v. Daniels,* 948 F.2d 1033 (6th Cir.1991). *U.S. v. Shriver,* 967 F.2d 572 (11th Cir.1992) is also a pre-Nov. 1, 1992 case involving a guilty plea. *Shriver* somewhat relied on the introductory language to Appendix A, but also relied on the holding in *Day* which, in turn, relied upon § 1B1.2. It is unclear which analysis was determinative. *See also U.S. v. Voss,* 956 F.2d 1007 (10th Cir.1992) (court concluded that there was no applicable guideline and that § 18 U.S.C. § 3553(b) applied).

court's sentence.  The court stated,

> The government also argues that the following language contained in the introduction to Appendix A of the guidelines authorizes the district court to select section 2C1.1 as the offense guideline:  "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, the court is to apply the guideline section which is most applicable to the conduct for which the defendant was convicted."

> It is not completely clear to us under what circumstances the commission contemplated deviation from the suggested guidelines for an "atypical case."  Given the emphatic statutory requirement that the "court shall apply the offense guideline section ... most applicable to the offense of conviction," the commentary cannot have the effect urged upon us by the government.  Section 1B1.2(a).  The government's interpretation of this commentary would give the district court, in choosing the offense guideline, the discretion to disregard the conduct essential to the conviction and base its selection on some other conduct.  We reject the government's argument therefore that the introduction to Appendix A authorizes the district court in selecting the offense guideline to disregard Brunson's conduct as an officer and director of the bank and rely instead on his activity as an assistant district attorney, a fact irrelevant to the conviction.  Such an interpretation of the commentary would conflict with the guideline itself.  In this circumstance the guideline clearly prevails.  *See* 28 U.S.C. S 994(a)(1) and (2);  section 1B1.7, Sentencing Guidelines.

*McCall* suggests that, in order for the Appendix A introductory comment to have application, the *facts alleged in the indictment* must suggest atypical circumstances or a severe "nature of the offense conduct."  We agree with the *McCall* analysis of the Appendix A language and with the holding in *Brunson* and conclude that the facts alleged in the indictment here do not allow the use of § 2H1.1 as a starting point and further conclude that the requirements of § 1B1.2(a) are not met.

We VACATE the sentence and REMAND for re-sentencing.  We express no opinion as to the appropriateness of an upward departure after application of the appropriate guideline or as to how any such departure should be measured.  *See* 18 U.S.C. § 3553(b) and § 5K2.0 of the Sentencing Guidelines.