United States Court of Appeals,

Eleventh Circuit.

No. 95-9552.

UNITED STATES of America, Plaintiff-Appellee,

v.

Brenda KUKU, Defendant-Appellant.

Dec. 2, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:94-CR-280-4-RCF), Richard C. Freeman, Judge.

Before BLACK, Circuit Judge, and HILL and HENDERSON, Senior Circuit Judges.

PER CURIAM:

Brenda Kuku (Kuku) was convicted of offenses arising from her participation in a conspiracy to unlawfully produce social security cards and sell them to illegal aliens. We address two issues raised by Kuku on appeal: (1) whether the district court erred in permitting a co-defendant witness to invoke the Fifth Amendment privilege after the co-defendant entered a guilty plea but before the co-defendant was sentenced; and (2) whether the district court erred in using U.S.S.G. § 2F1.1 rather than U.S.S.G. § 2L2.1 to calculate Kuku's sentence.[1] We hold that the district court properly sustained the witness' invocation of the Fifth Amendment privilege, but that the district court erred

---

[1]Kuku also raised the following issues: (1) whether the district court erred in admitting testimony regarding the prior convictions of Kuku's ex-boyfriend and ex-husband; (2) whether the evidence was sufficient to support Kuku's conviction for encouraging and inducing aliens to reside in the United States; (3) whether the district court erred in assessing a two-point enhancement to Kuku's sentence after determining that Kuku held a position of trust at the Social Security Administration; and (4) whether the district court erred in assessing a four-point aggravating role enhancement to Kuku's sentence. After carefully considering these issues, we affirm the district court. *See* 11th Cir. R. 36-1.

in using § 2F1.1 rather than § 2L2.1 to calculate Kuku's sentence.

## I. BACKGROUND

Kuku worked as a service representative for the Social Security Administration (SSA). Her duties included accepting social security applications, checking the applications for the required documentation, inputting applicant information into the SSA computer system, and processing changes to SSA records. SSA guidelines require that a social security application be accompanied by documentation establishing the applicant's age, citizenship, and lawful admission to the United States. Applicants over age 18 are required to have a personal interview.

Kuku used her position at the SSA to engage in a conspiracy in which social security cards were unlawfully produced and sold to illegal immigrants. Pursuant to the conspiracy, a number of individuals with close ties to the Indian and Pakistani communities in the Atlanta area solicited illegal aliens from those communities to purchase social security cards.[2] At trial, illegal aliens testified that they purchased the social security cards for various reasons, including to apply for federal benefits, to attend school, and to obtain employment. Kuku's role in the conspiracy was to approve the applications filed on behalf of the solicited illegal aliens, whom she never met. The applications were not accompanied by the required documentation. Social security cards were mailed to the illegal aliens at various in-state addresses, although it appears that some of the illegal aliens lived in other states. The testimony at trial regarding the number of cards produced by the conspiracy conflicted; between 800 and 1,300 cards were produced, and the illegal aliens were charged prices ranging from less than $100 to $800, with most cards being sold for prices between $300 and $500.

---

[2]The co-conspirators who solicited illegal aliens included Shanez Master, Sherali Master, and Minaz Ali Moody, all of whom were named in the indictment.

The three co-conspirators who solicited the illegal aliens each entered into plea agreements with the Government. Kuku went to trial and the jury convicted her of conspiring to defraud the United States, in violation of 18 U.S.C. § 371; encouraging and inducing aliens to reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv); making false statements on applications for social security cards, in violation of 18 U.S.C. § 1001; and producing social security cards without lawful authority, in violation of 18 U.S.C. § 1028(a)(1). The court sentenced Kuku to 60 months' imprisonment and 3 years' supervised release, and imposed a special assessment of $2,200 ($50 for each of the 44 counts on which she was convicted).

## II. MOODY'S INVOCATION OF THE FIFTH AMENDMENT

Kuku asserts the district court erred in permitting Minaz Ali Moody (Moody), one of Kuku's co-conspirators, to invoke his Fifth Amendment privilege when Kuku attempted to call Moody to testify at trial. At the time of Kuku's trial, Moody had entered a guilty plea and agreed to testify as a prosecution witness, but had not yet been sentenced. Kuku's counsel sought to elicit from Moody that Moody did not know Kuku in order to rebut testimony that Kuku was at the heart of the conspiracy. Kuku contends that her Sixth Amendment compulsory process and confrontation rights entitled her to compel Moody to testify.

The Government responds that Moody could properly invoke the Fifth Amendment because information elicited from Moody could have adversely affected his sentence. Furthermore, information elicited from Moody during the Government's cross-examination would have incriminated him in another crime involving the distribution of drivers' licenses to illegal aliens in exchange for money. The district court agreed with the Government that Moody's testimony posed a sufficient threat of self-incrimination to trigger the Fifth Amendment privilege.

The question of whether a defendant retains the Fifth Amendment privilege after entering

a guilty plea but before being sentenced is one of first impression in this Circuit. The other circuits that have considered the issue have all held that a defendant does retain the Fifth Amendment privilege until sentencing. *See United States v. De La Cruz,* 996 F.2d 1307, 1312-13 (1st Cir.1993) (defendant's right to compulsory process did not override witness' Fifth Amendment privilege, despite witness's guilty plea, where testimony could incriminate witness prior to sentencing or implicate witness in other crimes); *United States v. Hernandez,* 962 F.2d 1152, 1161 (5th Cir.1992) ("impending sentencing may furnish grounds for a legitimate fear of incurring additional criminal liability from testifying, in which case the privilege should remain in effect"); *United States v. Lugg,* 892 F.2d 101, 103 (D.C.Cir.1989) ("the convicted but unsentenced defendant retains a legitimate protectable Fifth Amendment interest in not testifying as to incriminating matters that could yet have an impact on his sentence").

We agree and hold that a defendant retains the Fifth Amendment privilege against self-incrimination prior to sentencing, despite having entered a guilty plea, because of the possible impact that compelled testimony may have on the defendant's as yet undetermined sentence. In addition, the prospect of Moody incriminating himself in a separate crime if compelled to testify permits him to invoke the Fifth Amendment privilege. The district court did not err in sustaining Moody's invocation of the Fifth Amendment privilege.

### III. THE DISTRICT COURT'S SENTENCING CALCULATION

Kuku contends that the district court erred in calculating her offense level based on U.S.S.G.

§ 2F1.1,[3] rather than on U.S.S.G. § 2L2.1,[4] which specifically applies to offenses involving counterfeit identification documents. We review the district court's factual findings for clear error and the district court's application of law *de novo. United States v. Kirkland,* 985 F.2d 535, 537 (11th Cir.1993).

A. *The District Court's Use of U.S.S.G. § 2F1.1*

In calculating Kuku's sentence, the district court determined the applicable sentencing guideline section for each offense of conviction by referring to the Statutory Index to the United States Sentencing Guidelines (Appendix A). U.S.S.G. § 1B1.1(a). The Statutory Index matches each federal criminal statute to a corresponding list of sentencing guidelines. Where multiple counts of conviction have been adjudged, the calculation process is repeated for each count. U.S.S.G. § 1B1.1(d). The district court grouped Kuku's offenses because they involved substantially the same harm, U.S.S.G. § 3D1.2, and used a single guideline to calculate the sentence. U.S.S.G. § 3D1.3(a). Pursuant to § 3D1.3(a), the district court selected this single guideline by determining which of the offenses in the group produces the "highest offense level of the counts in the Group." The district court determined that 18 U.S.C. § 1001 produced the highest offense level because Appendix A directs that violations of 18 U.S.C. § 1001 be sentenced based on § 2F1.1, which produced an offense level that was higher than the offense level produced by the guidelines for the other counts.[5]

---

[3]U.S.S.G. § 2F1.1 is entitled "Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." This guideline is applicable "to a wide variety of fraud cases." *United States v. Orton,* 73 F.3d 331, 333 (11th Cir.1996).

[4]U.S.S.G. § 2L2.1 is entitled "Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status, or a United States Passport; False Statement in Respect to the Citizenship or Immigration Status of Another; Fraudulent Marriage to Assist Alien to Evade Immigration Law."

[5]Our review is limited to the two guideline sections argued before the district court.

In reaching this determination, the district court overruled Kuku's objection and did not examine her underlying offense conduct to determine whether § 2F1.1 actually envisioned Kuku's offense conduct.

B. *Offense Conduct Underlying the Conviction*

There are two places in the sentencing guidelines that permit the district court to examine the underlying offense conduct to determine whether the case is atypical, thereby warranting application of another guideline: (1) the introductory note to Appendix A; and (2) Comment 13 to § 2F1.1.[6]

The introductory language of Appendix A explains: "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted. (*See* § 1B1.2.)." Section 1B1.2(a) of the Guidelines directs the court to determine the applicable guideline based on "the offense of conviction (*i.e.,* the offense conduct charged....)." U.S.S.G. § 1B1.2(a).[7]

This general focus on the offense conduct of the defendant is buttressed when applying § 2F1.1 by Comment 13, which states:

> Sometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense is also covered by a more specific statute.... Where the indictment or information setting forth the count of conviction ... establishes an offense more aptly covered by another guideline, apply that guideline rather

---

[6]The commentary is entitled to "controlling weight unless it is plainly erroneous or inconsistent" with the guideline itself. *See Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993).

[7]Under this Circuit's precedent, a district court should look at the specific offense conduct underlying the conviction to ensure that the listed guideline is actually appropriate in each case. *United States v. Shriver,* 967 F.2d 572, 574 (11th Cir.1992) (citing *United States v. Day,* 943 F.2d 1306, 1307 (11th Cir.1991)).

than § 2F1.1.

U.S.S.G. § 2F1.1, comment. (n. 13); *see also United States v. Castaneda-Gallardo,* 951 F.2d 1451, 1452 (5th Cir.1992) ("Comment 13 to § 2F1.1 explicitly grants the district court the discretion to look for the most applicable guideline when the Statutory Index refers the court to § 2F1.1."). Thus, the final question before applying § 2F1.1 is whether another guideline section more aptly covers the offense conduct on which the conviction was based.[8] Accordingly, it must be determined whether Kuku's offense conduct that violated 18 U.S.C. § 1001 is "more aptly" sentenced by a guideline other than § 2F1.1.[9]

---

[8]*See United States v. Carrillo-Hernandez,* 963 F.2d 1316, 1317-18 (9th Cir.1992) (determining which guideline was "most analogous" to the offense conduct underlying an 18 U.S.C. § 1001 conviction); *United States v. Obiuwevbi,* 962 F.2d 1236, 1242 (7th Cir.1992) (following Comment 13's instruction to determine which guideline more aptly covered the offense conduct underlying an 18 U.S.C. § 1001 conviction). The Seventh Circuit has examined Comment 13 to § 2F1.1 in *United States v. Rubin,* 999 F.2d 194 (7th Cir.1993). In *Rubin,* the defendant was convicted of criminal antitrust conspiracy for price fixing, and mail fraud for concealing the conspiracy. The offense level for the antitrust count was determined based on U.S.S.G. § 2R1.1 ("Antitrust Offenses"), and the offense level for the mail fraud count was determined by § 2F1.1. Because § 2F1.1 produced the more serious offense level, the district court used § 2F1.1 to calculate the sentence for the grouped counts. The Seventh Circuit reversed the district court's use of § 2F1.1 based on Comment 13, stating:

> [T]he defendants' mail fraud was directly related to the price-fixing scheme and was not a separate course of conduct.... The nature of the conduct charged in counts two and three dealt with price-fixing rather than with mail fraud. Therefore, Application Note 13 requires that the defendants be sentenced under the Antitrust Offense Guideline, section 2R1.1, and not under the Fraud or Deceit Guideline, section 2F1.1, even though the Statutory Index lists section 2F1.1 as the ordinarily applicable Guideline for offenses under [the mail fraud statute].

*Id.* at 199.

[9]The Government points to *United States v. Jackson,* 117 F.3d 533 (11th Cir.1997), for the proposition that the defendant's offense conduct is not the appropriate focus in selecting a guideline. In *Jackson,* a police officer was convicted of theft but was sentenced using § 2H1.1, the guideline governing civil rights violations, rather than § 2B1.1, the guideline for theft offenses. This Circuit held that the district court erred because the jury conviction was for theft and the indictment "did not *charge* a civil rights violation or give any indication that a civil

C. *Kuku's Specific Offense Conduct is More Aptly Characterized by § 2L2.1*

Kuku's offense conduct is more appropriately sentenced under § 2L2.1 than under § 2F1.1 for three reasons: (1) the descriptive language of § 2L2.1 more specifically characterizes Kuku's offense conduct than does § 2F1.1; (2) Comment 11 to § 2F1.1 suggests that Kuku's offense conduct is more aptly covered by § 2L2.1; and (3) the loss-based method of sentence enhancement used by § 2F1.1 does not suit the nature of Kuku's offense conduct.

First, the language of § 2L2.1 better describes Kuku's offense conduct. Each social security card produced by Kuku qualifies as "a Document Relating to Naturalization, Citizenship, or Legal Resident Status" under § 2L2.1. Section 2L2.1 has in fact been applied in cases involving counterfeit social security cards. *See United States v. Marquez,* 48 F.3d 243, 245 (7th Cir.1995) (referring to counterfeit alien registration cards and counterfeit social security cards as "counterfeit identification documents"); *see also United States v. Coello,* 899 F.Supp. 1240, 1243 (S.D.N.Y.1995) (defining "identification document" as any document which, when completed, is intended or commonly accepted to identify individuals). Accordingly, the conduct described in § 2L2.1 more aptly characterizes Kuku's offense conduct than the general language of § 2F1.1.[10]

Second, § 2F1.1 provides further assistance regarding the sentencing of offenses involving

---

rights violation was implicated." *Id.* at 536, 538. Kuku's indictment is distinguishable because the essence of her indictment was that she engaged in a conspiracy to traffic in unlawfully produced social security cards.

[10]The Ninth Circuit dealt with a factually similar decision between applying § 2F1.1 or § 2L2.1 in *United States v. Velez,* 113 F.3d 1035 (9th Cir.1997). In *Velez,* the defendant was convicted of filing false applications and false statements with the INS. The district court used § 2F1.1 to calculate the defendant's sentence. The Ninth Circuit looked to Comment 13 and reversed the district court, concluding that "the Index is only an "interpretive aid' and that courts should apply the "most applicable guideline.' " *Id.* at 1037. The Ninth Circuit explained that the district court should have applied § 2L2.1 because it more specifically addressed the defendant's offense conduct: "By its very title § 2L2.1 concerns false statements relating to naturalization and immigration." *Id.* at 1038.

counterfeit identification documents or access devices. In determining whether to sentence violations of 18 U.S.C. §§ 1028 and 1029 pursuant to § 2F1.1 or § 2L2.1, Comment 11 explains that § 2L2.1 more accurately describes offense conduct similar to Kuku's:

> Offenses involving fraudulent identification documents and access devices, in violation of 18 U.S.C. §§ 1028 and 1029, are also covered by this guideline. Where the primary purpose of the offense involved the unlawful production, transfer, possession, or use of identification documents for the purpose of violating, or assisting another to violate, the laws relating to naturalization, citizenship, or legal resident status, apply § 2L2.1 or § 2L2.2, as appropriate, rather than § 2F1.1.

U.S.S.G. § 2F1.1, comment. (n. 11). Although Comment 11 does not expressly address 18 U.S.C. § 1001, its analysis of the offense conduct is equally applicable. The primary purpose of Kuku's offense appears to have been assisting illegal aliens in violating the laws relating to naturalization, citizenship, and legal resident status, as contemplated by Comment 11. Indeed, the fact that Comment 11 describes Kuku's conduct but lists 18 U.S.C. §§ 1028 and 1029 rather than 18 U.S.C. § 1001 as the statute under which such conduct would be prosecuted suggests that the guidelines do not contemplate that Kuku's conduct would be prosecuted as a violation of 18 U.S.C. § 1001. Given this framework, it is difficult to imagine that Kuku's conduct is most aptly characterized as an 18 U.S.C. § 1001 offense resulting in a § 2F1.1 sentence.[11] A strict focus on the technicalities of the sentencing process obscures the overarching directive to match the guideline to the offense conduct

---

[11]The Government argues that Comment 11 of § 2F1.1 is literally inapplicable because the primary purpose of Kuku's production of the social security cards was to earn money, not to assist "another to violate, the laws relating to naturalization, citizenship, or legal resident status." U.S.S.G. § 2F1.1, comment. (n. 11). This argument proves too much. The Government's interpretation of Comment 11 would make § 2L2.1 applicable only where the offense conduct is engaged in for non-monetary reasons. The structure of § 2L2.1 belies this contention. Section 2L2.1(b)(1) explicitly assumes that the offense conduct was engaged in for profit, and then provides for a three-level reduction "[i]f the defendant committed the offense other than for profit." *See also United States v. Torres,* 81 F.3d 900, 902 (9th Cir.1996) (considering the issue of profit versus personal motive only to determine whether three-level reduction was applicable). Furthermore, we are only consulting Comment 11 for guidance in applying Comment 13.

which formed the basis of the underlying conviction.

Third, the method of sentence enhancement used by § 2F1.1 demonstrates the difficulty of applying that section to Kuku's offense conduct. The enhancement structure in § 2F1.1 is based in part on the amount of loss suffered by the victim as a result of the defendant's fraud. U.S.S.G. § 2F1.1(b)(1). The awkwardness in the present case arises because the loss suffered by the government from Kuku's conduct cannot be quantified. Comment 8 to § 2F1.1 suggests that the defendant's gain is an alternative estimate of loss, but states that this method "will ordinarily underestimate the loss." U.S.S.G. § 2F1.1, comment. (n. 8). It is not clear whether this alternative estimate of loss applies where the defendant's gain bears no relation to the loss suffered by the victim (the government).[12] This difficulty in determining loss demonstrates the problem with applying § 2F1.1 to the present facts. *See Velez,* 113 F.3d at 1038 (noting this difficulty). Section 2L2.1 is more appropriate in this context because subsection (b)(2) increases the offense level based on the number of documents fraudulently produced, rather than on the amount of loss to the victim.[13]

---

[12]*Compare United States v. Chatterji,* 46 F.3d 1336, 1342 (4th Cir.1995) (holding that gain may not serve as a substitute for loss where there is no actual loss), *United States v. Andersen,* 45 F.3d 217, 221 (7th Cir.1995) (not substituting gain for loss when sentencing defendant who sold cattle drugs without FDA approval because "there is no persuasive evidence of monetary loss"), *and United States v. Haddock,* 12 F.3d 950, 960-61 (10th Cir.1993) ("If gain to the defendant does not correspond to any actual, intended, or probable loss, the defendant's gain is not a reasonable estimate of loss.") *with United States v. Adam,* 70 F.3d 776, 781-82 (4th Cir.1995) (using gain as a substitute for loss in determining the sentence for a scheme in which physicians received kickbacks for referrals paid out of welfare funds, emphasizing the special Congressional findings regarding welfare fraud) *and United States v. Cambra,* 933 F.2d 752, 756 (9th Cir.1991) (using the defendant's gain to calculate § 2F1.1(b)(1) enhancement in case of fraud on the FDA involving the sale of counterfeit steroids).

[13]Kuku uses the awkwardness in determining loss to argue that § 2F1.1 should be used to calculate her sentence without any enhancement for loss, which would produce a lower offense level than is produced under § 2L2.1. Because we hold that § 2L2.1 is the appropriate guideline, we do not reach the merits of Kuku's argument; we merely note that Kuku's ability to make this argument demonstrates the awkwardness of applying § 2F1.1 to Kuku's offense conduct.

## IV. CONCLUSION

The district court did not err in sustaining Moody's invocation of the Fifth Amendment privilege.  The district court did, however, err in applying U.S.S.G. § 2F1.1 to calculate Kuku's sentence because § 2L2.1 more aptly characterizes Kuku's offense conduct.

AFFIRMED in part, VACATED in part, and REMANDED for resentencing.