[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-14811
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 6, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00448-CR-T-27-MSS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BETTY CHANDLER TRENT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 6, 2009)

Before ANDERSON, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Betty Chandler Trent appeals her convictions and 24-month sentences for conspiracy to commit offenses against the United States in violation of 18 U.S.C. §§ 2, 371, 666(a)(1)(A)(i), and (ii), theft by an agent of an organization of a state and local government in violation of 18 U.S.C. §§ 2 and 666(a)(1)(A)(i) and (ii), making false claims to an agency of the United States in violation of 18 U.S.C. §§ 2 and 287, theft from the United States in violation of 18 U.S.C. §§ 2 and 641, falsification of records in a federal investigation in violation of 18 U.S.C. §§ 2 and 1519, and making false and fraudulent statements in violation of 18 U.S.C. § 1001. According to the indictment, Trent, the executive director of the Brooksville Housing Authority (BHA), a public housing authority (PHA) established under the U.S. Housing Act of 1937, allegedly conspired with Joe Ann Bennett, the project manager for BHA, to unjustly enrich themselves by creating false and fraudulent bills and invoices for services purportedly provided to BHA from December 2001 until October 2006.

On appeal, Trent argues that the district court erred by denying her motion in limine and admitting audiotape recordings of conversations between herself, her co-conspirator, and a government informant because they contained hearsay. She asserts that her co-conspirator's statements were made after the cessation of the conspiracy in May 2003, and they were not made in furtherance of the conspiracy,

2

but rather furthered a separate conspiracy to conceal her prior conduct. Further, she maintains that the probative value of the informant's statements was substantially outweighed by the risk of prejudice because many of the conspirators' statements were inaudible.

We review "the district court's decision to grant or to deny a motion in limine for abuse of discretion." United States v. Fernandez-Larios, 402 F.3d 1148, 1161 (11th Cir. 2005). "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005).

There is not "any formulistic standard to guide the admissibility of tapes and transcripts." United States v. Greenfield, 574 F.2d 305, 307 (5th Cir. 1978). "Tapes are not per se inadmissible because they are partially inaudible; the issue is whether the unintelligible portions 'are so substantial as to render the recording as a whole untrustworthy. This determination is left to the sound discretion of the trial judge.'" Id. (quoting United States v. Avila, 443 F.2d 792, 795 (5th Cir. 1971)); see also United States v. Pope, 132 F.3d 684, 688 (11th Cir. 1998).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

3

asserted." Fed.R.Evid. 801(c). However, an informant's statements are admissible not for the truth of the matter asserted, but for the purpose of placing a conspirator's comments in context for the jury. See United States v. Smith, 918 F.2d 1551, 1559 (11th Cir. 1990). Further, an out-of-court statement offered for the truth of the matter asserted is not hearsay if it is being offered against a party, and it is a statement of a co-conspirator that was made during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E).

To establish the admissibility of a statement under Rule 801(d)(2)(E), "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir. 2006). "When determining whether the above elements have been satisfied, the district court may rely on information provided by the co-conspirator's proffered statement as well as independent external evidence." United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002). We apply "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." Id. "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." Id.

4

However, statements by a conspirator after the cessation of the conspiracy, "and which are merely narrative of past events (though in form a confession, i.e., an admission of the conspiracy), are not receivable against a fellow-conspirator, unless the latter was present when they were made and heard them, and expressly or by implication acquiesced in them." Clark v. United States, 61 F.2d 409, 410 (5th Cir. 1932). Further, "[s]tatements made after the cessation of the primary purpose of the conspiracy that served only to conceal the conspiracy are not protected by [Rule 801(d)(2)(E)]." United States v. Griggs, 735 F.2d 1318, 1324-25 (11th Cir. 1984). Nevertheless, "[c]oncealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the charged conspiracy." Id. at 1325. "This is particularly true in cases . . . [where] the object of the conspiracy . . . was not insular but continuous." Id.

The district court did not abuse its discretion in admitting the audiotape recordings because Trent's co-conspirator made the statements during and in furtherance of the conspiracy, and the informant's statements were admissible to provide context. While the September 20, 2006, recording was partially inaudible at times due to crowd noise at the restaurant, the transcript demonstrates that Trent and Bennett made numerous incriminating statements regarding their attempts to

5

convince Moore to submit false statements to federal investigators. Thus, the conversation was not so substantially inaudible as to render "the recording as a whole untrustworthy," and the district court did not abuse its discretion in admitting the audiotapes. See Greenfield, 574 F.2d at 307.

As for the statements by Bennett, Trent maintains that her statements were not made during the course of and in furtherance of the conspiracy under Fed.R.Evid 801(d)(2)(E). However, the recorded conversations all occurred from May to September 2006 prior to the cessation of the conspiracy in October 2006 as alleged in the superseding indictment. Further, the statements discussed specific overt acts of the conspiracy, including Trent and Bennett's involvement in filing a false tax return on behalf of Moore in July 2006, the co-conspirators' attempt to convince Moore to submit false statements to federal agents in September 2006, and Trent's submission of false statements to federal agents in October 2006. Moreover, even if the statements were made after the cessation of the primary purpose of the alleged conspiracy, they related to Trent and Bennett's attempts to conceal their unlawful conduct by filing false income tax returns and lying to federal investigators. Because the co-conspirators engaged in a continuing scheme of theft from the BHA from 2001 until at least 2003, the conspiracy was not "insular," and the concealment was a necessary part of the conspiracy. See

6

Griggs, 735 F.2d at 1325 (comparing schemes of tax evasion and fraud to a conspiracy to avoid immigration law through a sham marriage). Thus, the district court did not abuse its discretion in finding that Bennett's statements were admissible as statements of a co-conspirator under Fed.R.Evid. 801(d)(2)(E).

Additionally, Trent argues that the district court abused its discretion in permitting the jury to review a transcript of an audiotape recording during deliberations upon request by the jury. She asserts that the parties did not stipulate to the accuracy of the transcript, and the district court did not determine whether it accurately represented the recording. She submits that the error was not harmless because the jury rendered its verdict almost immediately after reviewing the transcript.

We review a "district court's evidentiary rulings for an abuse of discretion." United States v. Puentes, 50 F.3d 1567, 1577 (11th Cir. 1995). "When a jury considers evidence submitted to it, no reversible error occurs just because the evidence was not formally marked into evidence." United States v. Costa, 691 F.2d 1358, 1362 (11th Cir. 1982). District courts have "the authority to allow juries to read properly authenticated transcripts while listening to taped conversations." United States v. Garcia, 854 F.2d 1280, 1283 (11th Cir. 1988). "The need or desire for transcripts arises generally from two circumstances:" when

"portions of a tape . . . [are] relatively inaudible" or "it . . . [is] difficult to identify the speakers." United States v. Onori, 535 F.2d 938, 947 (5th Cir. 1976). In either case, "it is within the discretion of the trial court to allow a transcript to be used by the jury to assist the jury as it listens to the tape." Id. (quotation omitted).

The proper procedure for the production of transcripts provides that "the district court and the parties should make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides." Garcia, 854 F.2d at 1283 (quoting United States v. Wilson, 578 F.2d 67, 69-70 (5th Cir. 1978)). "If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions," and "each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version." Id. "[T]he use of transcripts is not restricted to the time of presenting the tapes to the jury." United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989). "Absent a showing that the transcripts were inaccurate or that specific prejudice occurred, there is no error in allowing transcripts to go to the jury room." United States v. Williford, 764 F.2d 1493, 1503 (11th Cir. 1985).

The district court did not abuse its discretion by permitting the jury to review a transcript of an audiotape recording during deliberations because portions

of the recording were inaudible, and the conversation involved multiple speakers. While the parties did not stipulate to an official transcript, Trent did not produce her own version of the transcript or her own version of the disputed portions. See Garcia, 854 F.2d at 1283. Although Trent speculates that some portions of the transcript were inaccurate, she does not demonstrate how these inaccuracies caused any specific prejudice, especially considering that the alleged inaccuracies did not involve any of the incriminating statements by Trent or Bennett. Further, Trent's argument that she could not anticipate the jury's request for the transcript during deliberations is disingenuous, because she explicitly speculated as much in her motion in limine. Because portions of the September 20, 2006, recording were inaudible, and the recording involved a conversation with multiple speakers, the district court did not abuse its discretion in allowing the jury to use the transcripts as an aid in reviewing the audiotape.

Trent also argues that there was insufficient evidence to support her convictions under 18 U.S.C. §§ 287, 371, and 641. She asserts that the government failed to show that her false claims were actually submitted to the United States under § 287, that the funds were property of the United States under § 641, or that she conspired to defraud the United States under § 371 because her

9

conduct targeted BHA rather than the Department of Housing and Urban

Development (HUD).

Ordinarily, we review the sufficiency of the evidence supporting a criminal

conviction de novo. United States v. Walker, 490 F.3d 1282, 1296 (11th

Cir. 2007), cert. denied, 128 S.Ct. 1649 (2008). However, we review only for

plain error where a defendant moved for judgment of acquittal on sufficiency-of-

the-evidence grounds before the district court, but failed to articulate the specific

sufficiency-of-the-evidence claim later raised on appeal. United States v.

Hunerlach, 197 F.3d 1059, 1068 (11th Cir. 1999). Under plain error review, we

will reverse only if "(1) an error occurred; (2) the error was plain; (3) it affected

[the defendant's] substantial rights; and (4) it seriously affected the fairness of the

judicial proceedings." United States v. Gresham, 325 F.3d 1262, 1265 (11th

Cir. 2003).

The district court's denial of a "motion[] for a judgment of acquittal will be

upheld if a reasonable trier of fact could conclude that the evidence establishes the

defendant's guilt beyond a reasonable doubt." United States v. Rodriguez, 218

F.3d 1243, 1244 (11th Cir. 2000). "It is not necessary that the evidence exclude

every reasonable hypothesis of innocence or be wholly inconsistent with every

conclusion except that of guilt, provided a reasonable trier of fact could find that

10

the evidence establishes guilt beyond a reasonable doubt." United States v. Young, 906 F.2d 615, 618 (11th Cir. 1990).  This is so because "[a] jury is free to choose among reasonable constructions of the evidence."  United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983).

To show a false claim under 18 U.S.C. § 287, the government must prove (1) "[t]hat the defendant made or presented a false, fictitious, or fraudulent claim to a department of the United States"; (2) "[t]hat the defendant knew such claim was false, fictitious, or fraudulent"; and (3) "[t]hat the defendant did so with the specific intent to violate the law or with a consciousness that what he was doing was wrong."  United States v. Slocum, 708 F.2d 587, 596 (11th Cir. 1983).  "[A] person may be guilty of causing a false claim to be presented to the United States [under § 287] even though he uses an innocent intermediary . . . to actually pass on the claims to the United States."  United States v. Beasley, 550 F.2d 261, 272 (5th Cir. 1977).  Thus, "false claims submitted to the state when the claimants knew that the state would rely on th[o]se claims for reimbursement from the federal government pursuant to a joint federal-state program fall within the federal false claims statute."  Id. at 273-74.

A defendant may be convicted for theft of government property under 18 U.S.C. § 641 if the government establishes (1) "that the money or property

11

belonged to the government"; (2) "that the defendant fraudulently appropriated the money or property to his own use or the use of others"; and (3) "that the defendant did so knowingly and willfully with the intent either temporarily or permanently to deprive the owner of the use of the money or property." United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993). "[W]hen an outright grant is paid over to the end recipient, utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal." United States v. Smith, 596 F.2d 662, 664 (5th Cir. 1979). "While identifiable funds appropriated for use in a federal program are in transit between their federal source and their intended recipient and are still subject to substantial federal controls, they remain federal funds" under § 641. Id. We have applied a "supervision and control" test in "prosecutions [under § 641] for misappropriation of funds from an intermediate entity that has received government monies for further disbursement to eligible recipients." McCree, 7 F.3d at 980.

To show a conspiracy under 18 U.S.C. § 371, "the [g]overnment must prove the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." United States v. Campa, 529 F.3d 980, 1002 (11th Cir. 2008). "The government does not need to prove that the defendants

12

accomplished the purpose of the conspiracy," and "the [overt] act can be innocent in nature, provided it furthers the purpose of the conspiracy." Id. "[T]he United States must be the target of a conspiracy to defraud under § 371," which includes "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of [g]overnment." United States v. Harmas, 974 F.2d 1262, 1267 (11th Cir. 1992). "A conspiracy may be effected where a defendant uses a third party to reach and defraud the government," and "[t]he fraud can be accomplished by deceit, craft or trickery, or at least by means that are dishonest." Id. (quotation omitted). Nevertheless, "the government need not allege or prove that the United States or an agency thereof was an intended victim of a conspiracy to commit an offense against the United States under § 371." Id. at 1268 (quotation omitted).

As to her conviction for Count 4, Trent only argues that the government failed to establish that her false claims were submitted to a department of the United States under § 287. However, according to the evidence, BHA was a PHA established under Florida law that received funding through HUD, a federal agency, to build, operate, and maintain public housing. BHA received funding from HUD through an annual contributions contract, wherein it promised to provide housing to low income households in exchange for federal funding from

13

HUD. HUD ensured that the funding allocated to BHA was spent properly through an annual review of its annual agency plan, including its past and future expenditures, and an annual independent financial audit. In the event of noncompliance with the regulations, BHA was required to provide an explanation and correct the error. See 24 C.F.R. § 903.23 (stating that HUD reviews annual agency plans to determine whether, inter alia, the plan is not prohibited or inconsistent with federal law).

This evidence established that there was a joint federal-state program between BHA, a state-created entity, and HUD, a federal agency, to provide public housing for low income households. While Trent did not directly submit false claims to HUD, BHA eventually submitted those past expenditures to HUD in its annual agency plan and the independent financial audit, which HUD reviewed on an annual basis to ensure compliance with the regulations. Thus, the evidence showed that BHA relied on Trent's claims for continued funding from HUD pursuant to a joint federal-state program, and a reasonable trier of fact could have concluded that the evidence established Trent's guilt beyond a reasonable doubt under § 287. See Beasley, 550 F.2d at 273-74.

With regards to her conviction for Count 5, Trent maintains that the government failed to show that the money or property stolen belonged to the

14

United States under § 641. HUD funding is available to BHA pursuant to its annual contributions contract with HUD. To receive funding under the contract, BHA was required to provide decent, safe, and sanitary housing to low income households, and it was required to comply with HUD's regulations. BHA could only use HUD funding for eligible work items, and an employee could not use the money for personal gain. After HUD's review of BHA's annual agency plan, it could conduct civil audits or a variety of other options in the event of the appearance of impropriety or noncompliance with the regulations.

Based on this evidence, a reasonable factfinder could conclude beyond a reasonable doubt that the converted funds were federal and that HUD maintained sufficient supervision and control over BHA. See McRee, 7 F.3d at 780; see also United States v. Hope, 901 F.2d 1013, 1020-21 (11th Cir. 1990) (holding that funding obtained through HUD through its loan program retained its federal character where the funds could be applied only toward eligible program activities, could not be diverted into interest bearing accounts or used for the benefit of another loan applicant, and grantees were required to repay the federal government for misappropriated or misapplied funds). Further, Trent's conviction under § 666(a)(1) was not necessarily inconsistent with her conviction under § 641 because the evidence showed that BHA retained some "care, custody, or control"

15

of the funds in its daily operations without HUD oversight, but nevertheless had to account for its expenditures on an annual basis to HUD in accordance with federal law.

Finally, as to her conviction under Count 1, Trent submits that the government failed to show that she conspired to defraud the United States under § 371 because her offenses targeted BHA rather than HUD, relying on Tanner. However, Trent did not raise this specific argument in her motion for judgment of acquittal as to Count 1; thus, this Court reviews for plain error. Hunerlach, 197 F.3d at 1068. However, Tanner specifically held that a conspiracy to defraud the United States may be accomplished through an intermediary, such as BHA. Because Trent does not dispute that there was sufficient evidence to show that she defrauded the BHA, the district court did not err, much less plainly error, in denying her motion for judgment of acquittal in this regard.

Finally, Trent argues that the district court erred by calculating a base offense level under U.S.S.G. § 2C1.1 instead of U.S.S.G. § 2B1.1. She asserts that the evidence did not justify application of § 2C1.1 because her primary criminal activity involved a scheme to defraud BHA in violation of 18 U.S.C. § 666(a)(1), relying on United States v. Kuku, 129 F.3d 1435 (11th Cir. 1997).

We review "a district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts de novo." United States v. Moriarty, 429 F.3d 1012, 1021 (11th Cir. 2005). In Kuku, we held that the district court erred by failing to consider the defendant's offense conduct in calculating his sentence under the Guidelines, specifically in light of the introductory note to Appendix A, U.S.S.G. § 2F1.1, comment. (n.13), and our prior precedent. Kuku, 129 F.3d at 1438-39 & n.7. The district court had calculated the defendant's guideline range based on § 2F1.1, which had produced the highest offense level under U.S.S.G. § 3D1.3(a). Id. at 1438. Because the defendant's offense conduct was more appropriately sentenced under U.S.S.G. § 2L2.1 than under § 2F1.1, we reversed and remanded for resentencing. Id. at 1439-41.

However, as noted by United States v. Poirier, 321 F.3d 1024, 1034 n.8 (11th Cir. 2003), the introductory note to the Statutory Index was amended in 2000 to "emphasize that the sentencing court must apply the offense guideline referenced in the Statutory Index for the statute of conviction unless the case falls within the limited 'stipulation' exception set forth in § 1B1.2(a)." Id. The amended introductory note provides: "If more than one guideline section is referenced for the particular statute, use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted."

U.S.S.G. app. A, introductory comment (2006). "The current guidelines merge § 2F1.1 with § 2B1.1" and include a new provision, § 2B1.1(c)(3), specifying that: "If [certain conditions are not applicable and] the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (offense Conduct), [courts should] apply that other guideline." Poirier, 321 F.3d at 1034 n.8.

The district court did not err in sentencing Trent under § 2C1.1 because that guideline specifically covered her offense conduct under § 371. Upon review of the record and consideration of the parties' briefs, we discern no error.

**AFFIRMED.**