UNITED STATES of America, Plaintiff–Appellee,

v.

Robert O. HARMAS, Defendant–Appellant.

No. 90–3604.

United States Court of Appeals, Eleventh Circuit.

Oct. 9, 1992.

---

John D. Cline, Tom McCoun, St. Petersburg, Fla., for defendant-appellant.

Charles Truncale, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before KRAVITCH and DUBINA, Circuit Judges, and RONEY, Senior Circuit Judge.

DUBINA, Circuit Judge:

The appellant, Robert Harmas ("Harmas"), appeals his conviction for fraud and other related counts. For the reasons which follow, we affirm.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

In 1986, Florida Federal Savings Bank ("Florida Federal") was the second largest savings and loan association in the Southeast and the third largest Guaranteed Student Loan Program ("GSLP") lender in the United States. Florida Federal's GSLP [1] was managed by its Student Loan Division.[2]

In the fall of 1986, Florida Federal's Student Loan Division became aware of problems with one of its computer collection systems. The system, known as "Hogan," recorded Florida Federal's collection activi-

ty and was designed to alert collectors within the Student Loan Division when a GSLP account became delinquent and required action. However, because Hogan malfunctioned, the Student Loan Division faced a potential loss of millions of dollars in insurance coverage on GSLP accounts.[3] The Student Loan Division promptly notified Harmas, Vice-President and Operations Manager of the Student Loan Division, and James L. Lamantia ("Lamantia"), Florida Federal's Assistant Vice–President and Manager of the Collection and Claims Department. Harmas advised Jeffery A. Flatten ("Flatten"), Senior Vice–President and the highest ranking official in the Student Loan Division, of the situation. To remedy the problem, Flatten ordered two collection agencies to service accounts in their early stages of delinquency while the Student Loan Division attempted to perform the collection activity on the accounts that were seriously delinquent; that approach proved impossible because the Student Loan Division employed only a small staff to service the GSLP program.

Sharon Oliphant ("Oliphant") and Sheree Willey ("Willey") of the Student Loan Division met with Harmas to discuss the prob-

---

**1.** The GSLP, through the United States Department of Education ("DOE"), makes low interest loans available to students to pay for costs of attending post-secondary schools. 34 C.F.R. § 682.100(a) (1986). Lenders lend their own funds and, in exchange, the federal government or a guarantee agency insures against their loss in the event of a default by the student borrowers. § 682.100(a), (d). Guarantee agencies are state or private nonprofit organizations that administer student loan insurance programs. § 682.100(a)(1).

**2.** Most of Florida Federal's student loan business was conducted through three guarantee agencies: The Office of Student Financial Assistance, Higher Education Assistance Foundation of St. Paul, Minnesota, and United Student Aid Funds, Inc., of Indianapolis, Indiana.

**3.** Pursuant to the federal guidelines, certain collection activity is required by a lender under the GSLP as a condition to receiving insurance payments. 34 C.F.R. § 682.401(c)(3) (1986). This collection activity, referred to as "due diligence," consists of letters, telephone calls, and attempts to personally contact borrowers if a loan becomes delinquent. 34 C.F.R. § 682.-

511(b)(1) (1986). The performance of due diligence is required at intervals from the point at which repayment is due and the loan account remains unpaid. *Id.* When a loan account remains delinquent for a certain period of time, generally 120 or 180 days, the loan is in default. 34 C.F.R. § 682.200 (1986). Upon default, and provided that the lender has complied with the due diligence requirements, the lender becomes eligible to receive full payment on the defaulted student loan. To receive payment, the lender submits a default insurance claim for payment of the entire outstanding principal balance and accrued interest due on the loan, as well as chronological documentation to the guarantee agency that supports its claim that it has performed the required collection activity. Once the lender's default insurance claim is paid, the guarantee agency can seek reimbursement by filing a reinsurance payment claim certifying that all requirements have been completed. A guarantee agency is not eligible for reinsurance unless it has complied with all of the required collection activity that has been performed on a loan account for which a default insurance claim was paid. 34 C.F.R. §§ 682.405, 682.406 (1986). In this instance the guarantee agency relied upon the lender's representations.

lem. They informed him that the loan accounts were maintained by two systems: Hogan and a DOS system, which involved recording the collection activity on handwritten collection logs. Oliphant and Willey believed that a fraudulent backdate could be entered in the Hogan documents with a password. The password would override the automatic system date, the date when the information was actually entered, and then allow one to generate records of fictitious collection activity. Unknown to the parties, Hogan's memory retained both the system's date and the fraudulent backdate and was accessible to prove the actual date of each fraudulent backdated entry. Thereafter, the Hogan accounts were backdated to make it appear that the Student Loan Division had been properly servicing the accounts, and all handwritten collection logs pertaining to the DOS system were falsified.

Eventually, the job of falsifying documents became so complex that Harmas instructed Oliphant to designate four collectors to falsify records full time. Those collectors were moved to the Data Entry Department an area away from the collections department so that the work could continue without interruption. Henry Schall and Gail Klinefelter were two of the persons designated to handle the GSLP accounts maintained by Hogan. A third collector, Sandra Ferguson ("Ferguson") was designated to work on falsifying the handwritten collection records. Ferguson created fraudulent collection logs that were included in the default insurance claims forwarded to the guarantee agencies. The fourth collector, Betty Will, served as a quality control manager for the project, ensuring that the false records of the collection activity comported with the federal regulations. All the remaining collectors assisted in the falsification activity, mostly by making handwritten entries in the collection logs. Monthly meetings were held and progress reports were made regarding the conspiracy. Collectors that refused to participate in the conspiracy were transferred to other departments.

In addition to the false chronological summaries, false demand letters were created because the guarantee agencies required that default insurance claims be supported by documentary evidence of the due diligence activity. Collectors obtained backdated final demand letters from the Word Processing Department, which were copied and included in the default insurance claim file. The original fraudulently backdated letters were destroyed.

In late April 1987, fearing disclosure to authorities by former employees, LaMantia ordered the falsification project stopped. Notwithstanding this order, it continued for several more months because previously submitted false claims were returned to Florida Federal for adequate documentation and default insurance claims were refiled two or three times before final approval for payment was given. This in turn affected the guarantee agencies because of the time lag between the submission of a reinsurance claim and payment by the federal government after filing.

In September 1977, Rene Rogers, a former collector who had refused to become involved in the criminal conspiracy, sent a letter to Eric Stattin ("Stattin"), Florida Federal's President, advising him of the conspiracy. Stattin ordered an internal inquiry. Subsequently, the Federal Bureau of Investigation was notified and an investigation was conducted. As part of the investigation, Harmas was interviewed. He admitted that the conspiracy occurred from 1986 to 1987 and that he had discussed the mechanics of the scheme with Flatten. He stated that the conspiracy was common knowledge throughout the Student Loan Division.

### B. *Procedural History*

A federal grand jury returned a forty-three count indictment against Harmas charging him with conspiracy to defraud and to commit offenses against the government, making false statements, making false claims, mail fraud, and stealing

government money.[4] Following a jury trial, Harmas was found guilty of all forty-three counts and was sentenced to two years imprisonment to run concurrently on each count. He then perfected this appeal.

## II. DISCUSSION

### A. *Conspiracy*

Harmas argues that Count One of the indictment should have been dismissed. Count One charged a conspiracy to defraud and a conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371.[5] He contends that Count One is duplicitous and that the district court should have limited the government's prosecution to one theory of prosecution.

Title 18 U.S.C. § 371 states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

In order to charge a violation under § 371, the government must show that the defendant conspired to commit one or more substantive offenses against the United States, or that the defendant conspired to defraud the government in any manner or for any purpose. *United States v. Sans,* 731 F.2d 1521, 1533–35 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). The statute is written in the disjunctive and should be interpreted as establishing two alternative means of committing a violation. *United States v. Elkins,* 885 F.2d 775, 781 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

Harmas cites *United States v. Minarik,* 875 F.2d 1186 (6th Cir.1989), in support of his argument that the government should have charged him with a conspiracy to commit offenses against the United States. *Minarik* held that a defendant charged under § 371 must be charged with a conspiracy to commit an offense against the government and not a conspiracy to defraud if there is a specific statute describing the conduct involved in the alleged conspiracy. *Id.* at 1193–94. The court went on to state that § 371's misdemeanor clause, which limits the punishment for conspiracies whose object is a misdemeanor to a punishment no greater than that of the underlying misdemeanor, would be defeated if prosecution as a felony was allowed under the defraud clause. *Id.* at 1194. However, in *United States v. Sans,* we held it permissible to prosecute under either the defraud clause or the offense clause regardless of whether there was a specific statute describing the conduct alleged in the conspiracy and regardless of whether the object of the conspiracy was designated a misdemeanor. 731 F.2d at 1534. Other courts have allowed prosecution under the defraud clause despite the availability of a separate statute. *See United States v. Mohney,* 949 F.2d 899, 905 (6th Cir.1991); *United States v. Bilzerian,* 926 F.2d 1285, 1301–02 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Reynolds,* 919 F.2d 435, 438–39 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1402, 113 L.Ed.2d 457 (1991); *United States v. Little,* 753 F.2d 1420 (9th Cir.1985). The Supreme Court has held that the existence of a specific statute encompassing the conduct charged under a § 371 conspiracy does not prevent a charge under the defraud clause. *Dennis v. United States,* 384 U.S. 855, 863–64, 86 S.Ct. 1840, 1845–46, 16 L.Ed.2d 973 (1966). Furthermore, in *Mohney,* the Sixth Circuit indicated that *Minarik's* holding was limited to the partic-

---

**4.** The government later filed a superseding indictment.

**5.** The conspiracy to commit an offense against the United States clause of section 371 requires

reference in the indictment to other criminal statutes that define the object of the conspiracy. Here the indictment charged violations of 18 U.S.C. §§ 2, 287, 641, 1001, and 1341.

ular facts of that case and did not automatically preclude a charge under the defraud clause where a relevant substantive statute existed. *Mohney*, 949 F.2d at 902. Consequently, we reject Harmas' argument since *Minarik* is contrary to *Sans* and because its holding appears restricted to the facts peculiar to that case.

■ Harmas also contends that his conviction under Count One must be reversed because there was insufficient evidence to sustain the conviction. The jury was charged that it could rely on any of the seven independent grounds alleged in Count One for conviction.[6] Where an indictment alleges a conspiracy with multiple objectives, the evidence need only support one of the purposes of the conspiracy in order to sustain the conviction. *United States v. Valdes–Guerra*, 758 F.2d 1411, 1414 n. 3 (11th Cir.1985). Nonetheless, Harmas contends that the verdict is erroneous since the jury returned a general verdict and it is not known upon which grounds the verdict in Count One was based.

■ At the outset, we note that Harmas waived any error in the jury instructions concerning Count One by failing to raise a timely objection or to request a special verdict form. At the charge conference, Harmas objected to the government's election to proceed under both a conspiracy to defraud and a conspiracy to commit an offense theory and requested that the government elect only one theory. Harmas also requested instructions requiring unanimous agreement by the jurors on any of the seven grounds alleged in the indictment. That instruction was given. The law is clear that "[n]o party may assign as error any portion of the charge or omissions therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed.R.Crim.P. 30. *See also United States v. Meester*, 762 F.2d 867, 879 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985) (defense counsel's reliance on co-counsel's objections and statement: "My objections have all been stated, Your Honor," did not comply with requirement of Fed.R.Crim.P. 30 that party state distinctly the matter to which he objects and the grounds for his objection). Thus to prevail, Harmas must show that the instruction amounted to plain error. "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." *Id.* 762 F.2d at 880. A review of the record indicates no facts rising to the level of plain error.

■ Moreover, the record indicates that there was sufficient evidence upon which the jury could have relied to support Harmas' conviction. In order to sustain a conviction under § 371, the government must show: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." *United States v. Cure*, 804 F.2d 625, 628–30 (11th Cir.1986). In *Tanner v. United States*, 483 U.S. 107, 128–32, 107 S.Ct. 2739, 2751–54, 97 L.Ed.2d 90 (1987), the Supreme Court held that the United States must be the target of a conspiracy to defraud under § 371. A conspiracy to defraud the United States is defined as "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966). A conspiracy may be effected where a defendant uses a third party to reach and defraud the government because § 371 "puts no limit based on the method used to defraud the United States." *Tanner*, 483 U.S. at 128–29, 107 S.Ct. at 2751–52. The fraud can be accomplished "by deceit, craft or trickery, or at least by means that are dishonest." *Hammer-*

---

**6.** Grounds (a) and (b) relate to the conspiracy to defraud the government. Grounds (c) through (g) relate to the conspiracy to commit crimes against the government, which relates to other substantive counts in the indictment.

*schmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). However, in *United States v. Falcone,* 960 F.2d 988 (11th Cir.1992) (en banc), we held that "the government need not allege or prove that the United States or an agency thereof was an intended victim" of a conspiracy to commit an offense against the United States under § 371. 960 F.2d at 990. *Falcone* overruled *United States v. Hope,* 861 F.2d 1574 (11th Cir.1988),[7] a case upon which Harmas relies. Thus, while the government must prove that the United States was the ultimate target of the conspiracy under the defraud clause of § 371, the government is not required to allege that the United States was the intended victim of a conspiracy under the offense clause of § 371.

▪ Here, the government presented evidence that Harmas conspired to defraud the guarantee agencies in order to recover the insurance money on the GSLP. Evidence was produced showing that Harmas' concealment of the false records caused the guarantee agencies to make fraudulent reinsurance claims to the DOE. Testimony was offered that a guarantee agency is not eligible for reinsurance unless all of the required collection activity is performed on the loan account. Representatives from various guarantee agencies testified that they had relied upon Florida Federal's representations concerning the collection activity. This related to all the student loan accounts for which reimbursement was sought during the relevant period of the conspiracy. DOE officials testified that reinsurance payments were made to the guarantee agencies by the DOE on all of the student loan accounts described in all of the substantive counts of the indictment. Clearly, the United States was the indirect

object of Harmas' conspiracy. Thus, the jury could reasonably have found that Harmas used the guarantee agencies as a third party conduit to effect a conspiracy to defraud the United States.

The jury found Harmas guilty of all of the substantive counts contained in the indictment including counts thirty-five through forty relating to objects (a) and (b), and counts forty-one through forty-three, relating to objects (c) through (g). In order to find Harmas guilty of these substantive counts, the jury must have determined that the United States was the target of the fraudulent reinsurance claims, which indicates that the jury chose to believe that the United States was also the object of the conspiracy. *See United States v. Dennis,* 786 F.2d 1029, 1038–40 (11th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 1974, 95 L.Ed.2d 814 (1987) (conviction on substantive accounts verified conviction of conspiracy count). Therefore, we affirm the conviction on Count One because we hold that there was ample evidence presented at trial to sustain the jury's finding that Harmas was guilty beyond a reasonable doubt of a conspiracy in accordance with § 371.

### B. *Severance*

▪ Harmas contends that the district court abused its discretion when it denied his motion for severance. He argues that he was denied a fair trial because his rights were prejudiced by a joint trial along with the other defendants in the case. Federal Rule of Criminal Procedure 14 states: "If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires." To

---

7. In *Hope,* we extended the rationale in *Tanner* to include the conspiracy to commit an offense against the United States clause and held that in order to sustain a conviction the government must allege and prove that the defendant conspired to injure the United States or one of its agencies. In *Falcone* we overruled *Hope's* holding stating that the offense clause encompasses all offenses against the laws of the United States, not just offenses directed against the

United States as a target or victim, and that the government need not allege or prove that the United States or an agency thereof was an intended victim of the conspiracy. *Falcone,* 960 F.2d at 990. *See also United States v. Falcone,* 934 F.2d 1528, 1548–51 (11th Cir.) (Tjoflat, C.J. specially concurring, joined by Powell, and Kravitch, JJ.), *vacated,* 939 F.2d 1455 (1991), *reinstated in part,* 960 F.2d 988 (1992).

compel severance the defenses must be more than merely antagonistic, they must be irreconcilable. *United States v. Bovain*, 708 F.2d 606, 610 (11th Cir.), *cert. denied*, 464 U.S. 898, 104 S.Ct. 251, 78 L.Ed.2d 238 (1983). To merit reversal, "more than some prejudice must be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice." *United States v. Berkowitz*, 662 F.2d 1127, 1132 (5th Cir. Unit B 1981). Because the record does not support Harmas' contentions, we hold that the district court's failure to sever Harmas' trial from that of his codefendants did not result in an abuse of discretion.

### C. *Admission of Exhibits*

■ Harmas argues that he was denied a fair trial because the district court improperly admitted several exhibits and summaries. Federal Rule of Evidence 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The admission of summaries "offers the only practicable means of making their contents available to the jury." *See* Notes of Advisory Committee to Rule 1006. In this case, the summaries were helpful to the jury's understanding and were properly admitted. The decision to admit or exclude evidence is within the discretion of the trial court and will not be overturned unless it is determined that there has been an abuse of discretion. *United States v. Duff*, 707 F.2d 1315, 1319 (11th Cir.1983). The evidence was introduced after counsel had laid the proper predicate and the information summarized was before the jury in the form of documentary evidence; therefore, we hold the district court did not abuse its discretion. *See United States v. Gold*, 743 F.2d 800, 816 (11th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).

### D. *Prosecutorial Misconduct*

■ Harmas contends that he was denied a fundamentally fair trial because the prosecutor's closing argument was improper. The prosecutor implied that the fraudulent false claims submitted to the guarantee agencies were actually made against the taxpayers. Harmas claims that the prosecutor's argument was designed to inflame the emotions of the jury and, in effect, asked the jurors to put themselves in the position of a litigant. *See Woods v. Burlington Northern R. R. Co.*, 768 F.2d 1287, 1292 (11th Cir.1985), *rev'd on other grounds*, 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987).

A prosecutor's comments must be viewed in the context of the record as a whole, and will be the basis for reversal only if they result in prejudice affecting the substantial rights of the defendant. *United States v. Reme*, 738 F.2d 1156, 1166 (11th Cir.1984), *cert. denied*, 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985). In this instance, we are not persuaded that the district court abused its discretion, nor does the record demonstrate that the prosecutor's comments prejudicially affected Harmas' rights.

### E. *Miscellaneous*

Harmas presents additional issues for review: (1) whether the district court erred when it failed to dismiss counts two through seventeen, counts thirty-five through thirty-seven, counts eighteen through twenty-one, and counts thirty-eight through forty, based on vagueness and failure to charge a criminal offense; (2) whether there was sufficient evidence to sustain counts eighteen through twenty-one, as well as whether there was a fatal variance between the allegations and the proof offered to those charges; and (3) whether there was sufficient evidence to sustain the conviction on counts forty-one through forty-three. After a thorough review of the record, we hold the arguments Harmas proffers concerning these issues to be meritless. The evidence, together with all reasonable inferences, viewed in the light most favorable to the government, supports the jury's determination of guilt beyond a reasonable doubt. *See United States v. Mena*, 863 F.2d 1522, 1529 (11th

**1270**

Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 109, 110, 107 L.Ed.2d 72 (1989).

### III. CONCLUSION

For the foregoing reasons, we affirm Harmas' conviction in all respects.

AFFIRMED.