[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 20, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15705

_____

D. C. Docket No. 05-00332-CR-2-RBP-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFF GERMANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 20, 2008)**

Before BIRCH, CARNES and COX, Circuit Judges.

BIRCH, Circuit Judge:

Jeff Germany, through counsel, appeals his convictions on four counts of

misapplication of government funds in violation of 18 U.S.C. § 666(a)(1)(A) and

(B) and 18 U.S.C. § 2 ("Counts 1-4") and one count of conspiracy to misapply government funds in violation of 18 U.S.C. § 371 ("Count 5"). Germany also appeals his forty-three month sentence. Germany argues that (1) the evidence was insufficient to support his convictions; (2) the indictment charged overt acts which occurred outside of the statute of limitations; (3) the indictment was constitutionally and procedurally defective; and (4) his sentence was unreasonable. After careful consideration, we are convinced otherwise. Accordingly, we AFFIRM.

## I. BACKGROUND

We divide our discussion of the background of this appeal into three parts. First, we discuss Germany's background and the procedural history of this case. Second, we examine how county commissioners in Jefferson County, Alabama, disburse funds within their respective districts. Third, we discuss how Germany disbursed government funds during the period covered in the indictment.

A. Germany's Background

Germany was elected as a county commissioner for District Two of Jefferson County, Alabama in November 1990. Jefferson County consists of five districts, each represented by an elected commissioner. Germany's district covered much of the city of Birmingham, Alabama. His duties as commissioner included

2

serving the public and administering various departments of the county government. Each commissioner is also assigned administrative functions at the beginning of his four-year term. One of Germany's assigned functions was commissioner of health and human services, with county-wide responsibility for indigent health-care. Germany ultimately served District Two for three consecutive four-year terms.

On 28 July 2005, a grand jury in the Northern District of Alabama returned a five-count indictment against Germany. A superceding indictment was returned by the grand jury in early September 2005 and a second superceding indictment was returned on 28 September 2005. The second superceding indictment charged Germany with four counts of misapplication of government funds and one count of conspiracy to misapply government funds.

Germany was tried and convicted on all counts by a jury in June of 2006. Prior to his trial, Germany filed several motions with the district court, two of which are relevant to our discussion. The first was a motion to dismiss parts of Count 5 for violation of the statute of limitations and the second was a motion to dismiss the indictment for duplicity and vagueness. The district court denied both motions.

Germany was sentenced in October 2006. After ruling on all objections, the

district court determined Germany's offense level to be 24, with a criminal history category I, yielding an advisory guideline range from fifty-one to sixty-three months. The district court sentenced Germany to forty-three months of imprisonment on each count to be served concurrently, a two-year term of supervised release, and $126,830 in restitution to Jefferson County.

In order to better frame the issues before us, we now take a closer look at how Jefferson County commissioners disburse funds within their respective districts.

B. The Disbursement Process

The Jefferson County budget is approved by law each year on 1 October, the beginning of the fiscal year. Each preceding summer, the five county commissioners meet for a budget hearing, during which budgets for various county departments are set and certain funds are set aside for recurring annual appropriations. At the same time, a nondepartmental budget and a park fund are set. Each of the five districts receives an equal share of both the nondepartmental budget and the park fund. A district's share of the nondepartmental budget is often referred to as the district commissioner's "discretionary funds" or simply as "district funds." These funds are to be used to assist with projects within a commissioner's district. The district funds available to a commissioner in any

4

given year usually amount to several hundreds of thousands of dollars. In addition, each commissioner has access to about $95,000 in park funds.

Jefferson County uses a contract approval process for the disbursement of district funds. Generally, a commissioner's office makes a request to the county finance department for funds to be allocated to a particular organization.[1] The finance department then gathers information about the recipient organization's 501(c)(3) status, its financial statements and its most recent fiscal year budget. If all is in order, the finance department then draws up the contract and sends it to the county attorney's office for legal review. After the legal review, the recipient organization signs the contract, agreeing to its terms. The contract is then presented to the commission for a vote. If approved, the finance department then generates a check for the recipient organization.

Generally, all contracts concerning the disbursement of district funds contain the same boilerplate language – the contracts differ only in the amount to be disbursed and specifications governing how the funds are to be spent. Other, unwritten, county policies bound the district fund disbursement process.[2] As previously noted, funds can only be disbursed to not-for-profit, 501(c)(3)

---

[1] The only entities eligible to receive such funds are not-for-profit, 501(c)(3) organizations or certain organizations affiliated with the state, like municipalities or school boards.

[2] These policies also govern the disbursement of park funds.

organizations. Funds cannot be directed to for-profit corporations nor can any funds be spent on county employees, elected officials, their friends or family members. In addition, funds cannot be routed through a qualifying non-profit organization to other organizations.

The unusual demand voucher ("UDV") procedure is an alternative means occasionally employed to disburse district funds but more often used with park funds. UDVs expedite the disbursement process. The UDV process requires a commissioner, or a member of his staff, to request disbursement of park funds from the park administrator, a county official who administers the park funds for all five county commissioners. Each request must be accompanied by receipts or invoices, documenting the labor or materials for which the park funds are to be spent.

After receipt of the UDV request and the accompanying documentation, the park administrator prepares the UDV, has it signed by the requesting commissioner, and has it placed on the agenda for the next county commission meeting. In lieu of placing the UDV on the commission agenda for approval, a majority of three commissioners can approve the UDV with their signatures.

With this overview of the disbursement process in mind, we now discuss how Germany disbursed his district and park funds during the period covered in

6

the indictment.

C. Germany's Disbursement of District and Park Funds

1. District Funds to Jefferson County Committee of Economic Opportunity

In October 2000, Germany's office submitted a request to the county finance department for $217,500 of funding for the Jefferson County Committee of Economic Opportunity ("JCCEO"). The $217,500 was to come out of Germany's district funds. JCCEO is a non-profit, 501(c)(3) organization that provides services for low-income people and was well-known to the county commission. Although JCCEO occasionally requests funding from the commission for particular services, it made no such request to Germany or any other commissioner in October of 2000. Nevertheless, Germany's request went through the county's contract approval process and was approved by the commission.[3] On 24 October 2000, the contract was signed by the president of the county commission and the executive director of JCCEO, Gail Cunningham.

A day after the contract was signed, Germany sent Cunningham a check for $217,500, along with a letter written on county commission letterhead. In the

---

[3] The contract named JCCEO as the sole recipient of the funds and specified that the JCCEO would "[p]rovide for continuation and implementation of youth services, programs, and activities through JCCEO (child development services, summer youth employment programs in conjunction with the City of Birmingham Division of Youth Services, alcoholism, outreach and aftercare program, day treatment program, youth gang prevention programs, etc."). R6-47; Govt. Exh. 2 at 3.

letter, Germany instructed Cunningham to disburse $180,000 of the $217,500 to eleven organizations not affiliated with JCCEO. Although Germany's administrative assistant at the time, Charles Cockrom, testified that he provided the county finance department with information concerning these eleven organizations, there is no evidence that the finance department ever received any such notice, in the form of a letter or otherwise.

Cunningham testified that she did not know whether any of the eleven organizations named in Germany's letter were non-profit, 501(c)(3) entities or whether they all had youth programs. According to Cunningham, her only role regarding the county funds was to write checks "[b]ecause this was a project that Commissioner Germany made choices about and managed, as far as I knew. My only role, our only role, was to write the payment checks. The payees were selected and provided to us in letters from him [Germany] and we were not asked to do anything further." R7 at 101-02.

Three of the organizations that received funds from JCCEO at the direction of Germany were MedHealth Management ("MedHealth"), American Charities Foundation, Inc. ("American Charities"), and the East Thomas Baseball Association ("ETBA"). Because these entities are named in the indictment against Germany, we detail Germany's connection with each of them in turn.

a.  JCCEO Check to MedHealth

In his 25 October 2000 letter, Germany directed JCCEO to disburse $19,000 to MedHealth.  MedHealth was a for-profit corporation founded, owned, and operated by Horace Miller from 1996-2001.[4]  Mindful of Germany's position as commissioner for public health for the county, Miller frequently petitioned Germany for funding for his healthcare business.  Ultimately, Miller received several checks totaling about $38,000 from Germany.  On each occasion, JCCEO was the drawer of the check.  Miller either picked up the check directly from the secretary of JCCEO or received the check from Germany himself in the lounge of the Tutwiler Hotel in downtown Birmingham.

In October of 2005, Miller and Germany met once again in the Tutwiler lounge.  At this point, Miller had a request for funding pending through Germany.  At the meeting, Germany asked Miller to help Germany's wife, Lois Germany, buy a car, claiming that she was having difficulty securing financing.[5]  Miller complied and helped Lois Germany find a 1997 Mercedes E320 with a purchase price of $33,950.  Lois Germany took possession of the car on 3 October 2000 with no down payment.  On 16 October 2000, Miller made an $8000 down payment on the

_____

[4] Miller also worked as an automobile salesman at MedCenter Mazda during the same period.

[5] A representative from the bank that ultimately financed the car claimed that Lois Germany had excellent credit.

9

Mercedes. On 31 October 2000, Miller received a check from JCCEO made out to MedHealth for $19,000. The next day, Miller deposited the check into his MedHealth account and made a second down payment on Lois Germany's Mercedes, this time for $9000.[6] Nine days later, on 10 November 2000, Miller received an unsolicited check for $2000 from American Charities as a scholarship for his son.

b. JCCEO Check to American Charities

In late October 2000, JCCEO wrote a check to American Charities for $20,500 pursuant to Germany's instructions in his 25 October 2000 letter. On 3 November 2000, Germany wrote another letter to JCCEO, requesting that it disburse an additional $2000 to American Charities. JCCEO complied the same day.

American Charities was a non-profit, 501(c)(3) organization founded and directed by Joseph Turnes.[7] Although it received support from other sources, over 90% of American Charities' funding came through Germany's office via JCCEO. In order to secure funding, Turnes would correspond directly with Germany by letter. He never applied for funding through either JCCEO or any other county

---

[6] Miller testified that there was no quid pro quo arrangement with Germany. He stated that he took it upon himself to make the $17,000 down payment on Lois Germany's Mercedes.

[7] American Charities was founded, according to Turnes, to "raise[] money and ... distribute[] it in the community." R8 at 183. Turnes was the organization's sole employee.

body. Once funds were received by American Charities, Turnes disbursed the money in accordance with instructions from Germany.

After depositing both the $20,500 and $2000 checks from JCCEO, Turnes drew a $3000 check on the American Charities account for Angela Allen, an ex-girlfriend of Germany's. Turnes wrote in the memo line of the check: "JCCEO/Germany/Financial Asst Charity-Medical Illness." R8 at 632; Govt. Exh. 24. Allen testified that she did not request any specific amount of assistance from American Charities and stated that she was not ill at the time that she received the check. As of the beginning of the trial, Turnes had never met Allen and did not know her.

On 6 November 2000, Turnes drew another check ($4500) on the American Charities account, this time made out to Yvonne Stakey.[8] Starks testified that she was a very good friend of Germany's and had approached him about securing some funds in order to defray certain living expenses. According to Starks, Germany referred her to American Charities. Starks claimed that she submitted some paperwork to American Charities and then received a check for $4500. Once again, Turnes did not know Starks as of the date of the trial and had never met her.

_____

[8] Although the check was made out to Yvonne Stakey, the correct spelling of her last name is Starks.

11

Finally, as previously discussed, on 10 November 2000, Turnes wrote a check to Horace Miller for $2000, ostensibly as a scholarship for Miller's son. Turnes wrote the check at Germany's behest. Turnes did not know Miller and, as of the date of the trial, had never met Miller and Miller had never applied to American Charities for a scholarship for his son.

c. JCCEO Check to East Thomas Baseball Association (ETBA)

In his 25 October 2000 letter to Cunningham, Germany also directed that $17,000 of the original $217,500 "grant" to JCCEO be disbursed to the ETBA, care of Larry Combs. Larry Combs was Germany's best friend. Combs worked for the Birmingham-Jefferson Transit Authority and as a manager for an apartment complex.[9] In April 1997, he opened an account at Citizens Federal Savings Bank under the name of East Thomas Baseball Association.[10] Combs was the sole signatory on the account. The listed address for the ETBA was Combs's home address.

---

[9] Combs had no other source of income apart from what he earned with the Transit Authority and as an apartment complex manager.

[10] In 1997, another East Thomas Baseball Association was founded by Ozelle Henderson, Don Pugh, Max Mills and Lonny Miles. This organization was a legitimate little league baseball association based in East Thomas Park. It had a checking account at SouthTrust Bank. Combs did not have access to this account, he did not coach at East Thomas Park and he did not serve on this organization's board of directors. Combs did contribute a combined total of about $4000 to this organization over several years but was otherwise not associated with it in any way. At no point did this organization receive any funding from JCCEO or from Jefferson County.

On 3 November 2000, JCCEO wrote a $17,000 check to the ETBA that was subsequently deposited into Combs's ETBA account at Citizens Federal Savings Bank. Within a month, Combs had withdrawn over $11,000 from the account, mostly in the form of checks made to cash. Combs gave part of the money ($4000) to Clifton McElroy. McElroy, Combs and Germany had been friends since high school and both Combs and Germany occasionally borrowed money from McElroy.

During this same time frame, Combs wrote numerous checks to Germany drawn on his personal checking account at SouthTrust Bank. From late October to December 2000, Combs gave Germany $8200 in the form of checks drawn on Combs' SouthTrust Bank account made payable to Germany or checks made to cash and later endorsed by Germany.[11] As noted earlier, Combs had no source of income other than what he earned at the Transit Authority or as manager of an apartment complex.

2. Park Funds to the ETBA

As county commissioner, Germany had access to about $95,000 of park funds each year. Generally, requests for park funds were made through the UDV

---

[11] Germany also wrote checks to Combs during this same period. Although funds were frequently exchanged between Combs and Germany, Germany ultimately ended up over $26,000 ahead.

process previously discussed. In October 2001, Germany's office requested $14,990 of park funds to be directed to Combs's ETBA via the UDV process. Although the accompanying documentation was in the form of a price quote instead of the required invoice, the UDV request worked its way through normal channels and was ultimately approved by the county commission. On 8 November 2001, Jefferson County issued a check for $14,990 to Combs's ETBA.

The check was deposited into Combs's ETBA account on 9 November 2001. Between 9 November 2001 and 15 January 2002, Combs withdrew about $12,500 from the account. A check for $4000 went to Germany's friend, McElroy.[12] Combs also wrote several checks to cash totaling about $8500 and wrote a $1500 check to the Birmingham Business Resource Center in partial repayment of a $6000 loan.

3. Disbursement of District and Park Funds Outside Period of Indictment

Germany directed his district and park funds to Combs's ETBA on several occasions outside the period specified in the indictment. Combs, in turn, distributed much of these funds to Germany's friends and associates. He also wrote several checks to cash out of the ETBA account, made several large deposits into his personal account at SouthTrust Bank and wrote several checks to Germany

---

[12] As of the date of the trial, Germany owed McElroy about $15,000.

14

drawn on his personal account. Much of this activity occurred between 1998 and 2000. The government relies on this pattern of activity to support its conspiracy charge in Count Five.

By and large, Germany employed the same modus operandi from 1998 through 2000 as he did during the time frame covered by Counts One through Four. On two occasions – once in October 1998 and then again in December 1999 – Germany directed a portion of his district funds to JCCEO. As with the 2000 "contract" with JCCEO, Germany presented the JCCEO with a check and a letter directing Cunningham to disburse funds to particular organizations. As a result, the ETBA received a $6000 check from the JCCEO in January 1999. It also received a $15,000 check in December 1999, this time from American Charities.[13] During roughly the same time frame – 1998 through 2000 – Germany also directed park funds to the ETBA via the UDV process. In November 1998, $15,000 was sent to the ETBA in the form of a UDV initiated by Germany. No invoices or other required supporting documentation accompanied the request.[14] Again, in June 1999, Germany made an $18,000 UDV request to Combs's ETBA for park

[13] In December 1999, Germany directed $85,500 of his district funds to JCCEO. He then directed Cunningham to disburse $43,000 to American Charities. Germany then instructed Turnes (of American Charities) to disburse $15,000 to ETBA.

[14] The UDV request did not go before the commission as an agenda item but was approved by the truncated approval process (requiring only the signatures of three commissioners). Germany was one of the signatories.

work and uniforms. The supporting documentation included a price quote for uniforms and a price quote for landscaping from Omega Landscaping. Although the UDV request was approved and Combs's ETBA received the $18,000, no landscaping work was ever provided.

Over the course of several years, Combs disbursed funds from his ETBA account to a number of Germany's friends and associates. Allen, Germany's ex-girlfriend, received a $2500 check from Combs's ETBA, ostensibly for clerical work. McElroy, Germany's high school friend and sometime moneylender, received about $13,000 in checks out of the ETBA account. Combs also wrote an $8000 check to the Platinum Club, to cover costs for a fund-raiser held for the ETBA,[15] and a $1500 check to Renee Dismuke, Cunningham's secretary at the EECO.

From November 1998 to November 2002, Combs also wrote about $46,000 worth of checks made out to cash on his ETBA account. He then deposited a significant amount of cash into his personal account at SouthTrust Bank.[16] As previously discussed, Combs and Germany exchanged a good deal of money over

_____

[15] There was no evidence that any funds were actually raised at the fund-raiser and the owner of the Platinum testified that he could not recall how he and Combs were to split the proceeds or cover any losses.

[16] The evidence indicated that Combs deposited about $70,000 into his personal account during this time period.

16

the years. Combs either wrote checks payable to Germany directly or wrote them to cash and Germany subsequently endorsed them. Germany did the same for Combs. In the end, however, a defense witness calculated the total amount of money sent from Combs to Germany at about $75,734 and the total amount sent from Germany to Combs at about $48,780 – a difference of around $26,000 in favor of Germany.

Germany argues that (1) the evidence was insufficient to support his convictions; (2) the indictment charged overt acts which occurred outside of the statute of limitations; (3) the indictment was constitutionally and procedurally defective; and (4) his sentence was unreasonable. We now address each argument in turn.

## II. DISCUSSION

A. Sufficiency of the Evidence Argument

"We review de novo a defendant's claim that the evidence was insufficient to convict him, viewing the evidence and all reasonable inferences and credibility choices in the light most favorable to the government." United States v. Anderson, 289 F.3d 1321, 1325 (11th Cir. 2002). A jury's verdict must stand "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d

17

761, 762 (11th Cir. 1991).  In addition, we have held that "convictions challenged

on sufficiency of the evidence grounds can be affirmed based on a finding that a

jury reasonably could infer from circumstantial evidence that the defendant[] acted

knowingly and willfully." United States v. Lockhart, 167 Fed. Appx. 111, 112

(11th Cir. 2006) (per curiam) (quoting United States v. Gafyczk, 847 F.2d 685, 692

(11th Cir. 1988)).

For Counts One through Four, Germany contends that the government's

evidence fails to sufficiently prove the intent element, and on Count Five he argues

lack of proof of an agreement between himself and Combs.[17]  We conclude that

both of Germany's sufficiency of the evidence arguments are wholly without merit.

First, we consider Germany's intent to misapply government funds as charged in

Counts One through Four.

Although direct evidence of Germany's intent is limited, the circumstantial

evidence is overwhelming.  When viewed in the light most favorable to the

government, the evidence presented at trial clearly supports Germany's

convictions.  Germany directed a substantial amount of the district and park funds

at his disposal to conduit entities – e.g., JCCEO, American Charities and the ETBA

---

[17] Germany does not argue, and we do not consider, the sufficiency of the evidence as to
the remaining elements of the charged misconduct.

18

– which, in turn, funneled those monies on to Germany's friends, associates and, in many instances, back to Germany himself. The funds steered to the JCCEO were almost always unsolicited. Moreover, they were usually accompanied by specific instructions from Germany directing the JCCEO to disburse funds to organizations not named in the contract between the county and the JCCEO, in effect bypassing the county approval process altogether.

The recipient organizations were usually connected to Germany in some form or fashion. MedHealth was a for-profit corporation run by Miller, an associate of Germany's.[18] MedHealth received $19,000 through JCCEO after Miller "helped" Germany's wife obtain a Mercedes by spontaneously providing a $17,000 down payment on the car. Miller then received an unsolicited $2000 "scholarship" from American Charities, another organization funded by JCCEO at the express direction of Germany. American Charities also cut checks to Allen, Germany's ex-girlfriend, and Starks, a "very good friend" of Germany's, all pursuant to Germany's instructions. Allen and Starks then used the funds for personal expenses and incidentals.

The ETBA was also a prime beneficiary of Germany's largesse. Founded and directed by Germany's best friend (Combs), the ETBA received funds from

---

[18] County rules prohibited county funding for for-profit organizations like MedHealth.

Germany both via JCCEO and through the UDV request process.[19]  The ETBA's working address was Combs's home address and Combs was the sole signatory on the ETBA account.  Another association with the same name existed contemporaneously with Combs's ETBA.  That organization started little league in East Thomas Park and raised money in order to hire youth baseball and football officials.  Combs was not associated with that organization nor were any county funds directed to it.  Instead, county funds steered towards Combs's ETBA were either deposited into Combs's ETBA account or funneled through the ETBA and on to Germany's friends and associates, e.g.,  McElroy, Allen, the Platinum Club, Dismuke and others.

Germany contends that there is no direct evidence of any agreement between himself and Combs and, as such, the evidence is insufficient to sustain his conviction on Count Five.  We have held that "[i]n order to sustain a conviction under 18 U.S.C. § 371, the government must show (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy."  United States v. Brenson, 104 F.3d 1267, 1281-82

---

[19] Germany initiated both UDV requests for county funds to be directed to ETBA.  Each request was accompanied with insufficient supporting documentation but each was approved nonetheless.

(11th Cir. 1997) (quoting United States v. Harmas, 974 F.2d 1262, 1267 (11th Cir. 1992)).  Likewise, we have held that direct evidence is not required to sustain a conspiracy conviction.  Indeed, "[t]here is rarely any direct evidence of an agreement to join a criminal conspiracy, and thus the defendant's assent can be inferred from acts that furthered the conspiracy's purpose." United States v. Miller, 693 F.2d 1051, 1053 (11th Cir. 1982) (per curiam) (internal quotation and citation omitted).

The circumstantial evidence in support of Charge Five is substantial. Germany initiated both UDV requests for park funds for ETBA.  The first request was accompanied by almost no supporting documentation.  The second request came with price quotes for uniforms and landscaping services.  No invoices were included and no landscaping services were ever provided.  Nevertheless, both UDV requests were approved by the commission and paid out to ETBA.  Once the funds hit Combs's ETBA account, he almost immediately began writing checks to cash and disbursing funds to Germany's friends and associates, as previously discussed.  At the same time, Combs deposited large amounts of money into his personal account.  He then wrote several checks directly to Germany and others to cash, which were later endorsed by Germany.  Although Germany also wrote several checks to Combs during this period, Germany's own witness testified that

21

Germany ultimately came out ahead, to the tune of about $26,000.

Our cursory sketch of the record has yielded ample proof on which the jury could find Germany guilty beyond a reasonable doubt on all counts. Our confidence in the verdict is undiminished by the circumstantial nature of much of the evidence. "As we have explained, it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Anderson, 289 F.3d at 1325 (internal quotations omitted) (quoting United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997)). In this case, the evidence was sufficient for a reasonable trier of fact to arrive at such a conclusion and, as such, we conclude that Germany's sufficiency of the evidence argument must fail.

B.  Indictment Charged Overt Acts Occurring Outside the Statute of Limitations

In the district court, Germany challenged the government's inclusion of certain charged overt acts in Count Five, claiming that their introduction was barred by the statute of limitations.[20] As previously discussed, the district court

---

[20] As noted by the district court, Germany contended that overt acts 1 through 14, 20 through 37, and 49 through 72 were alleged to have occurred prior to 28 July 2000, outside the five-year statute of limitations applicable to § 666.

denied Germany's motion. Germany now renews his argument before us.[21]

"We review the district court's denial of a motion to dismiss the indictment for abuse of discretion, but the sufficiency of an indictment is a legal question that we review de novo." United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002) (citations omitted). We apply an abuse of discretion standard of review when considering a trial court's application of Rule 403. See United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006).

The district court correctly observed that although the limitations period normally begins to run on the date on which a crime is complete, some offenses, such as conspiracy, are deemed "continuing offenses" because they are committed over a period of time. United States v. Gilbert, 136 F.3d 1451, 1453 (11th Cir. 1998). For continuing offenses, the statute of limitations commences on the date of the last overt act in furtherance of the crime. Id. at 1453 n.4. The statute of limitations is a bar in a conspiracy action only in the event that no overt action in furtherance of the conspiracy occurs within the limitations period. Grunewald v. United States, 353 U.S. 391, 396-97, 77 S. Ct. 963, 969-70 (1957). In this case, the indictment contains multiple overt acts which occurred within the limitations

---

[21] Germany's argument stresses the unfairly prejudicial impact of the evidence compared to its probative value and so is largely predicated on Federal Rule of Evidence 403.

23

period.  We concur with the district court's reasoning and conclude that the district court correctly denied Germany's motion.  In addition, mindful that we "look at ... [Rule 403] evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact[,]" we find Germany's Rule 403 argument equally unpersuasive.  Smith, 459 F.3d at 1295 (quoting United States v. Elkins, 885 F.2d 775, 784 (11th Cir. 1989).

C.  Indictment was Constitutionally and Procedurally Defective

Germany's third argument centers on several alleged deficiencies in the government's second superceding indictment.  Specifically, Germany contends that the indictment insufficiently references 18 U.S.C. § 2 and fails to state essential facts with particularity.  We address each argument in turn.

As we noted previously, "the sufficiency of an indictment is a legal question that we review de novo."  Pendergraft, 297 F.3d at 1204.  "Generally, an indictment is sufficient if it: 1) sets forth the elements of the offense in a manner which fairly informs the defendant of the charge against which he must defend and 2) enables him to enter a plea which will bar future prosecution for the same offense."  United States v. Poirier, 321 F.3d 1024, 1028 (11th Cir.) corrected on other grounds, 2003 WL 21211926 (11th Cir. 2003) (quoting Belt v. United States, 868 F.2d 1208, 1211 (11th Cir. 1989)).  Moreover, we have held that "when

analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations." Poirier, 321 F.3d at 1029 (quoting United States v. Gold, 743 F.2d 800, 813 (11th Cir. 1984) (internal quotations omitted)).

1.  Indictment Insufficiently References 18 U.S.C. § 2

Germany contends that the indictment was defective because the government's reference to "Section 2" in the indictment failed to indicate which subsection – (a) or (b) – applied. His argument fails because it runs counter to both the language in the indictment and our circuit precedent. Counts One through Four of the indictment charged that Germany "did knowingly, willfully, and intentionally misapply, and cause to be misapplied" funds and property, inter alia. R1-13 at 1-3. This language clearly tracks that in § 2(b) ("Whoever willfully causes an act to be done. . . .") and fairly informs Germany of the charges against which he must defend. 18 U.S.C. § 2(b). Furthermore, we have held that a defendant can be convicted under § 2 even when the statute itself is not mentioned in the indictment. United States v. Hornaday, 392 F.3d 1306, 1311-12 (11th Cir. 2004).

2.  Indictment Fails to State Essential Facts with Particularity

Germany also argues that the indictment fails to state with sufficient

25

particularity the distinction between "funds and property," the identity of "persons

known to the grand jury," the amount of the funds valued at "$5000 or more," and

the identity of the "conduit entities and individuals" named in the indictment.  For

the following reasons, we disagree and conclude that Germany's arguments are

without merit.

    a.  Funds and Property

Each count of the indictment specifies "funds and property."  R1-13 at 1-11.

Germany contends that because the government failed to describe the type of

property misapplied or the value of the property versus the value of the funds, the

indictment was defective.  Germany's support for this proposition comes in the

form of a First Circuit case that is readily distinguishable on its facts from this

case.  Moreover, we have previously found an indictment sufficient that alleged

that defendants "did knowingly and willfully devise and intend to devise a scheme

. . .  to defraud Fulton County, Georgia, and its citizens of <u>money and property</u>. . .

." <u>Poirier</u>, 321 F.3d at 1029.  We find that a commonsense construction of the five

counts charged in the indictment and the over 150 overt acts listed therein fairly

informed Germany of the charges against which he had to defend.

    b.  Identity of Persons Known to the Grand Jury

Germany next argues that the government's use of the phrases "person

26

whose identity is known to the Grand Jury" and "unnamed co-conspirator" are fatal to the indictment. Our circuit precedent and the facts in the record dictate otherwise. Indictments that include the phrase "persons known to the grand jury" regularly pass muster in our circuit. See United States v. Luiz, 102 F.3d 466 (11th Cir. 1996) (per curiam); United States v. Metallo, 908 F.2d 795 (11th Cir. 1990); United States v. Williams, 203 Fed. Appx. 976 (11th Cir. 2006) (per curiam). In addition, the record indicates that the government provided Germany with the identities of the persons referenced in the indictment in its response to Germany's motion for a bill of particulars and in its response to Germany's motion for a pretrial evidentiary hearing.

    c.  Funds Valued at $5000 or More and Identity of Conduit Entities and Individuals

Finally, Germany contends that the indictment is impermissibly vague because the government failed to identify the funds valued at $5000 or more in Counts Two and Five and failed to specify the identities of the conduit entities and individuals in Count Five. Once again, the record refutes Germany's argument. As previously noted, the government disclosed the identities of entities and individuals named in the indictment as well as the evidence relating to the "funds valued at $5000" in response to defense discovery requests and in response to the defense motion for a bill of particulars. We conclude that that information,

27

coupled with the list of over 150 overt acts for Count Five, more than adequately appraised Germany of the nature of the charges brought by the government.

D.  Germany's Sentence was Unreasonable

In Germany's last argument, he contends that his sentence was unreasonable for two reasons.  First, he argues that his sentence violates Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000) and its progeny, because it was based on enhancements unsupported by a jury verdict.  Second, he contends that the district court erred in applying the two-level enhancement for "status as a public official," pursuant to U.S.S.G. § 2B1.1(b)(8)(Mar. 2006).  We turn to Germany's Apprendi argument first.

Germany argues that the district court based its sentence on a finding that the amount misapplied was $479,990, when post-judgment expert testimony showed that the amount misapplied was $159,490.  He concludes that his sentence should be vacated because he was sentenced on facts neither proven to a jury, nor admitted by him.

As Germany did not object to the amount of the loss determination on the basis of Apprendi or United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), in the district court, our review is for plain error.  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).  When reviewing for plain error, we can reverse

28

if there is (1) error; (2) that is plain; (3) that affects substantial rights, and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

After Booker, "the use extra-verdict enhancements in an advisory guidelines system is not unconstitutional." United States v. Chau, 426 F.3d 1318, 1323 (11th Cir. 2005) (per curiam) (internal quotation and citation omitted). The district court may find facts not found by a jury, nor admitted by a defendant, and use them in formulating a sentence, as long as the district court properly applies the advisory guidelines. Id. at 1324. "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI [Presentence Investigation], or evidence presented during the sentencing hearing." United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004).

In this case, the district court explicitly acknowledged that the sentencing guidelines were advisory. The district court excluded and included payments in its amount of loss calculation based upon the testimony of James Kiel, a special agent with the Alabama Attorney General's office and chief investigator in this case.[22]

_____

[22] The district court made specific, detailed factual findings regarding the amount of loss and ultimately excluded nearly $200,000 from its loss calculation. The testimony and factual findings concerning the amount of loss inquiry filled about 100 pages of transcript.

29

As the district court's sentence was imposed under advisory guidelines, its use of extra-verdict factual findings was not improper. Accordingly, Germany's challenge to the district court's authority to make such extra-verdict factual findings is without merit.

We now address Germany's contention that the district court erred by applying a two-level enhancement for his "status as a public official." Although Germany cites § 2B1.1(b)(8) as the relevant guidelines provision, presumably he means to challenge the § 3B1.3 enhancement for abusing a position of public trust. Germany alleges that because the enhancement and the substantive offenses were based on the same conduct, the enhancement's application constitutes double counting. He contends that a necessary element of an 18 U.S.C. § 666(a)(1)(A) violation is the defendant's status as a public figure.

We review allegations of impermissible double counting <u>de novo</u>. <u>United States v. Dudley</u>, 463 F.3d 1221, 1225-26 (11th Cir. 2006) (per curiam). However, because Germany did not allege that any of the enhancements were improper based on a theory of double counting before the district court, our review is limited to plain error. See <u>Kahn v. Olshan</u>, 371 F.3d 1296, 1300 (11th Cir. 2004).

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that

has already been fully accounted for by application of another part of the Guidelines." Dudley, 463 F.3d at 1226-27 (internal quotation and citation omitted). The sentencing guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public . . . trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In addition, the abuse of trust enhancement "may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." Id. However, the enhancement is not to be used if "an abuse of trust or skill is included in the base offense level or specific offense characteristic." Id.

Germany's statutory offense was a misapplication of governmental funding. 18 U.S.C. § 666(a)(1)(A). The applicable base offense level guideline provision is § 2B1.1(a)(2). This guideline provision applies to a wide variety of basic economic offenses including larceny, embezzlement, fraud, and misapplication of government funds. There is no language in the text of § 2B1.1(a) itself or in the applicable commentary that contemplates the abuse of a position of public trust as inherent in any application of § 2B1.1(a). The commentary for § 3B1.3 defines public trust as a "position ... characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3. cmt. n.1. Again, this language is not mirrored in

31

either § 2B1.1(a)'s text or commentary.

Germany's double counting argument is without merit. Germany's base offense level was based upon his misapplication of government funds. An abuse of a position of public trust is not accounted for in applying the base offense level to his statutory violation. See U.S.S.G. § 2B1.1(a)(2). Rather, an abuse of a position of public trust more accurately describes how Germany misapplied the government funds. Moreover, the remaining specific offense characteristic enhancements do not account for an abuse of trust. See Dudley, 463 F.3d at 1226-27. Germany's aggravated role enhancement can be applied in tandem with an abuse of trust enhancement. See U.S.S.G. § 3B1.3. The amount of loss enhancement is based strictly upon a monetary calculation and does not take an abuse of trust into account. See U.S.S.G. § 2B1.1(b)(1). Accordingly, because Germany's base offense level and the other enhancements do not take into account his abuse of a position of public trust, the application of the § 3B1.3 enhancement cannot constitute impermissible double counting.

### III. CONCLUSION

Germany appeals his convictions on four counts of misapplication of government funds and one count of conspiracy to misapply government funds. Germany also appeals his forty-three month sentence. He argues that (1) the

evidence was insufficient to support his convictions; (2) the indictment charged

overt acts which occurred outside of the statute of limitations; (3) the indictment

was constitutionally and procedurally defective; and (4) his sentence was

unreasonable.  As we have explained, we conclude that the evidence was sufficient,

the indictment was legally sound and the sentence was reasonable.  Accordingly,

we AFFIRM.